**Gordon M. GUILBERT, Plaintiff-Appellee,**

v.

**PHILLIPS PETROLEUM COMPANY, Defendant-Appellant.**

**Gordon M. GUILBERT, Plaintiff-Appellant,**

v.

**PHILLIPS PETROLEUM COMPANY, Defendant-Appellee.**

**Nos. 73-2138, 73-2139.**

United States Court of Appeals, Sixth Circuit.

Argued April 12, 1974.

Decided Sept. 20, 1974.

Raymond R. Murphy, Jr., Chattanooga, Tenn., on brief, for appellant.

Ray H. Moseley, Humphreys & Hutcheson, Chattanooga, Tenn., on brief, for appellee.

Before PECK and McCREE, Circuit Judges, and CECIL, Senior Circuit Judge.

JOHN W. PECK, Circuit Judge.

The plaintiff, Gordon M. Guilbert, instituted this action against Phillips Petroleum Company (hereinafter "Phillips") for damages, both in contract and in tort for misrepresentation, stemming from Phillips' refusal to grant Guilbert an oil jobbership in the Chattanooga, Tennessee area. A jury trial in this diversity case resulted in a verdict in favor of Guilbert for $40,000 compensatory and $30,000 punitive damages on the combined contract and tort claims. Phillips filed a motion for a new trial or, alternatively, to amend the judgment. The district court, treating the motion to amend the judgment as a motion for judgment notwithstanding the verdict, set aside the judgment for punitive damages but sustained the judgment for compensatory damages. The court also set aside the verdict of the jury that Guilbert was entitled to recover upon a theory of contract. Each party perfected an appeal from the final judgment of the district court and the appeals were consolidated in this court.

In July of 1969 Guilbert was an accountant employed as a manager for the national accounting firm of Ernst & Ernst in their local office in Chattanooga, Tennessee. He had been employed by Ernst & Ernst continuously for a period of thirteen years and was one to three years away from potential partnership with the firm. Elevation to partner would most likely have involved a transfer to another location. Guilbert did not want to leave the Chattanooga area, however, because he and his wife had just had a mongoloid child and they were advised that the Siskin Foundation and the Orange Grove Center facilities in Chattanooga could provide much needed assistance with this child.

In early July of 1969, Mr. Bill Mayes, district manager for Phillips in the Chattanooga area, contacted Guilbert to inquire as to whether he might be interested in taking over an oil jobbership for Phillips in the Chattanooga area. Phillips had been attempting to operate its stations in the area on a direct basis since 1966 but had, according to Mayes, come to the conclusion that it would be more profitable to operate through a jobber. Although initially dubious about his lack of experience in the oil business, Guilbert told Mayes that he was interested.

At one of their early meetings Mayes prepared and gave to Guilbert a document purporting to reflect what Guilbert could expect to be the first year monthly operating income and expenses as well as projected operating income and expenses for the third year. According to the figures in that document, Guilbert could expect to earn $2,500 per month or approximately $30,000 the first year before taxes and his salary, and the anticipated earnings in the third year before taxes and owner's salary would be over $100,000. However, in a similar document sent to Phillips' home office at about the same time for the purpose of justifying a jobbership operation, Mayes projected that the cash flow would only be about $4,100 the first year. Mr. Cherry, one of Mayes' superiors in the home office, later calculated that Guilbert would lose $39,000 the first year rather than make $30,000. The apparent reason for the variance between the projection that Mayes handed Guilbert and the one sent to his home office was that the former was based on gallonage figures through December 31, 1968, while the latter was based on the lesser gallonage actually being pumped during July of 1969. Guilbert was never advised of the difference between the cash flow projections.

On the strength of Mayes' representations concerning projected income and Phillips' commitment to a jobber operation, Guilbert arranged for the capital necessary to purchase the jobbership ($100,000), formed a corporation for the purpose of taking over the jobbership, and prepared and submitted a personal financial statement to Mayes. Guilbert testified that Mayes led him to believe that all that he had to do was to meet the financial requirements and submit a formal application to Phillips to obtain the jobber contract. Guilbert also notified Ernst & Ernst of his intention to terminate and began to turn over his accounts to other members of the firm. The date set for termination was November 30, 1969. During October and November 1969 he took two weeks vacation to attend a jobbership dealer school sponsored and held by Phillips. On November 18, 1969, just two weeks before the jobbership was to commence, Mayes called Guilbert to advise him that Phillips was not going to convert to a jobbership arrangement, but was going to continue to operate on a direct basis.

Guilbert demanded to know the name of the man in the home office who had made the decision and was referred to Mr. Cherry. Cherry told him that Mayes had not been told to look for a jobber and that Phillips had never been committed to a jobber operation in Chattanooga. Guilbert was assured by Cherry that he was not turned down because of his qualifications, either personal or financial.

Guilbert raises three issues on appeal: (1) He argues that the district court erred in setting aside the verdict of the jury that he was entitled to recover on a contractual theory; (2) that the court similarly erred in setting aside the punitive damages award; and (3) that the court erred in refusing certain instructions on punitive damages arising from gross negligence. We will consider the above contentions in order.

Guilbert's contract arguments were based upon the theory that Phillips made a unilateral offer to him to enter into a jobber contract based upon the single condition that his financial and sales ability be approved at the home office. He asserts that he met this condition as evidenced by his forming a corporation, arranging necessary financing, and. attending jobbership school. He also alleged that Mayes told him that approval was "more or less automatic." The district court found, however, that there was no unilateral offer by Phillips because "approval by the defendant's home office was essential to the award of a distributorship contract" and that approval was not forthcoming.

■■ Although it is true that Guilbert did complete a number of acts necessary for obtaining the jobber contract, his own testimony reveals that Phillips reserved the right to approve his application.

"Q. Did anyone at Phillips ever tell you that if you formed a corporation, they would give you the jobbership?

"A. No.

"Q. Did anyone at Phillips ever tell you that if you went and saw Ansley Moses [the banker through whom Guilbert arranged the loan], asked for a commitment, they would give you a jobbership?

"A. No.

"Q. Did anyone ever tell you that if you went to school for two weeks, they would give you the jobbership?

"A. No, that's not the reason they suggested I go to the jobber school."

Under Tennessee law, contracts subject to a condition precedent do not come into being unless the condition is performed. Real Estate Management v. Giles, 41 Tenn.App. 347, 293 S.W.2d 596, 599 (1956). Phillips' approval was necessary to the formation of a binding contract in this case, and that approval was not given. Guilbert's application constituted no more than an offer which Phillips had the right to reject. We conclude, therefore, that the district court acted properly in setting aside the jury verdict on the contractual issue.

Guilbert's second contention is that the district court erred in setting aside the award of punitive damages. In stating its reasons for so doing, the court said:

"With respect to the jury award of damages, the Court is of the opinion that there was no evidence upon which the jury could have made an award of punitive damages. To permit an award of punitive damages the jury would have been required to find not only that the defendant had been guilty of a fraudulent and intentional misrepresentation, but that the misrepresentation was gross, wanton, aggravated or oppressive in nature. [Citations omitted.] There is no evidence in this case of an aggravated or malicious misrepresentation on the part of the defendant. The evidence presented upon the trial of the case would at most reflect that the representatives of the defendant, in negotiating with the plaintiff, were either negligent or recklessly careless in providing the plaintiff with information regarding the projected income and with regard to the defendant's commitment to convert their operation in Chattanooga to a jobber or contract distributorship."

Guilbert takes the position that the jury's verdict was supported by ample evidence of gross negligence upon which an award of punitive damages could have been based. A thorough review of the record leads us to believe, however, that the district court's action in this regard did not constitute an abuse of discretion.

Tennessee law provides for punitive damages where there is evidence of fraud, malice, gross negligence or oppression. Bryson v. Bramlett, 204 Tenn. 347, 321 S.W.2d 555 (1959); Bland v. Smith, 197 Tenn. 683, 277 S.W.2d 377 (1955). What is required is a showing that the party being "punished" acted with total disregard for the consequences of his acts. Lazenby v. Universal Underwriters Ins. Co., 214 Tenn. 639, 383 S.W.2d 1 (1964). In the instant case there is evidence that Phillips' agent, Mr. Mayes, acted negligently in his dealings with Guilbert. Mayes assured Guilbert that Phillips intended to employ a jobber when in fact the home office was not committed to that course of action. Further, Mayes used six month old gallonage figures in preparing a projected income flow chart for Guilbert. But Guilbert himself testified that Mayes had, on more than one occasion, warned him not to "burn his bridges" because the deal was subject to home office approval. This is hardly indicative of the gross negligence that Guilbert alleged, and it is clear that the district court acted within its discretion in setting aside the award of punitive damages.

The final assertion made by Guilbert is that the district court erred in refusing to give instructions with reference to the allowance of punitive damages arising from gross negligence. In view of the fact that we found no error in the court's conclusion that there was insufficient evidence to support an award of punitive damages, it is clear that the refusal to give instructions on punitive damages was not erroneous.

Phillips appeals from the $40,000 judgment against it on the grounds that Tennessee does not recognize negligent misrepresentation as a cause of action, and that if it does, the amount of damages awarded was not supported by the evidence. Neither point is well taken. In Tartera v. Palumbo, 224 Tenn. 262, 453 S.W.2d 780 (1970), the Supreme Court of Tennessee was asked to decide if a cause of action for negligent misrepresentation existed under Tennessee law. Justice Dyer answered that question in the affirmative in his opinion.

"We have noted in our research in actions for negligent misrepresentation the courts have had difficulty in determining the nature of the action and the procedure to be used. There is an excellent article on this subject in Harvard Law Review, Vol. 42, p. 733 (April 1929), entitled 'Misrepresentation as Deceit, Negligence, or Warranty.' We view the action as one in tort determined by the general principles of the law of negligence subject to the normal defenses to such action." 224 Tenn. at 272–273, 453 S.W.2d at 784.

As to the amount of the award, we are satisfied that the evidence supports the amount determined by the jury.

For the reasons hereinabove set forth, the judgment of the district court is affirmed.