**In re Darrell Franklin McFARLAND and Brenda Kay McFarland, Debtors.**

**John F. WEAVER, Trustee, Plaintiff,**

v.

**FORD MOTOR CREDIT COMPANY, Defendant.**

Civ. No. 3–90–394.
Bankruptcy No. 3–88–02464.
Adv. No. 3–89–0081.

United States District Court,
E.D. Tennessee, N.D.

Sept. 24, 1990.

John F. Weaver, Knoxville, Tenn., for plaintiff.

Steven D. Lipsey, Knoxville, Tenn., for defendant.

## MEMORANDUM OPINION

JARVIS, District Judge.

This appeal arises out of a judgment by the bankruptcy court [1] ordering that the security interests held by Ford Motor Credit Corporation ("FMCC") on two automobiles be avoided as preferential transfers pursuant to 11 U.S.C. § 547(b) so that the plaintiff trustee can recover the avoided transfers for the benefit of the estate. 112 B.R. 906 In this appeal, FMCC contends that the bankruptcy court erred because the certificates of title for the two automobiles were timely applied for within ten days after the debtors had "acquired rights" in those automobiles as required by § 547(e); thus, the security interests held by FMCC were not preferential transfers. Oral argument was heard on August 31, 1990. For the reasons that follow, this court will reverse.

### Facts

A district court may not properly overturn a factual determination by a bankruptcy court unless the district court determines the findings to be clearly erroneous. *In re: Southern Industrial Banking Corporation*, 809 F.2d 329, 331 (6th Cir.1987) (citing *Martin v. Bank of Germantown*, 761 F.2d 1163, 1165 (6th Cir.1985)). In the instant case, the court concludes that the bankruptcy court's findings of fact are not clearly erroneous. In fact, the parties do not dispute the facts, but only the legal significance of those facts as they relate to the events which transpired on September 2, 1988. The bankruptcy court's findings of fact, as adopted by this court, are as follows:

Prior to September 2, 1988, the debtors, Darrell McFarland and Brenda

McFarland, owned a 1987 Nissan 300 ZX. As of September 2, 1988, Home Federal Savings & Loan of Knoxville ("Home Federal") held a lien on the Nissan securing a loan in excess of $19,000.

Due to a change in the work schedule of Darrell McFarland, the debtors found they needed two cars. They decided to trade the Nissan automobile and obtain two new automobiles provided they could arrange for the combined monthly payments on the two new vehicles to approximate the payments on the Nissan. Consequently, the debtors went to Gary Yeomans Ford ("Gary Yeomans") and discussed their proposal with salesman Mark Cohen. The discussion eventually led to an agreement whereby the debtors agreed to purchase a 1988 Ford Escort and a 1988 Ford Bronco II upon the condition that the debtors could obtain approved financing through FMCC. To effectuate the agreement, the debtors on September 2, 1988, executed "Car Buyer's Offer and Purchase Option Contract" ("purchase option contracts") for both new automobiles. These agreements stated the price the debtors would pay for the new vehicles if they exercised their options to purchase. To exercise their options, the debtors could pay in cash the agreed sums or, in the words of the option agreements, they could execute "a retail installment sales contract subject to acceptance of such contract by a lending institution acceptable to Seller and payment in cash or equivalent...." [2] The debtors were unable to pay cash, so before leaving Gary Yeomans on September 2, 1988, they executed "Tennessee Vehicle Retail Instalment Contract[s]" ("installment contracts") for each new vehicle.

Both installment contracts, dated September 2, 1988, expressly advised the debtors in bold print that "[b]y signing this contract you choose to buy the ve-

---

1. The Honorable John C. Cook, United States Bankruptcy Judge.

2. As noted by the bankruptcy court, the purchase option contract covering the Bronco was

not executed by a representative of Gary Yeomans; however, this fact was not significant in the resolution of this case by the bankruptcy court nor is it in this appeal.

hicle on credit under the agreements on the front and back of this contract." The contracts also recited "[b]y signing below, the seller accepts this contract." The contracts were signed by an agent of Gary Yeomans.

Aside from the representations contained in the two purchase option contracts, the debtors and representatives of Gary Yeomans orally agreed that the installment contracts were subject to FMCC's financing both vehicles. The debtors were not interested or able to complete the sale if financing were approved for only one vehicle. The retail installment contracts expressly provided the purchasers were giving security interests in the vehicles.

After the debtors had executed the purchase options and installment contracts, Gary Yeomans retained the debtors' Nissan and the debtors were given the new automobiles to take home. No mileage restrictions or driving limitations were placed upon the debtors' use of the new automobiles.

On or about September 6, 1988, FMCC received from Gary Yeomans via computer the request for financing the new automobiles. After financial and credit evaluations, FMCC agreed to finance the purchase of the Escort. FMCC did not agree, however, to finance the purchase of the Bronco. Through further negotiations with Gary Yeomans and after Gary Yeomans agreed to guarantee $2,500 of the purchase price, FMCC finally agreed on September 15, 1988, to finance the Bronco. The installment contracts executed by the debtors were then assigned from Gary Yeomans to FMCC.

During the period of time between September 2 and September 15, 1988, while financing was still pending, Darrell McFarland temporarily ceased using the Bronco fearing he would be unable to obtain financing. It appears that on September 15, 1988, the day FMCC agreed to finance the purchase of the Bronco, the debtors and Gary Yeomans were preparing to reexchange vehicles believing that financing on the Bronco would not be obtained.

On September 16, 1988, Gary Yeomans issued a check for $19,326.63 to Home Federal to pay the outstanding balance on the lien on the Nissan.

With financing approved on both vehicles, Gary Yeomans submitted applications for Tennessee certificates of title on the vehicles. The application for title on the Bronco was submitted September 19, 1988. The application for the Escort was submitted September 21, 1988. Both applications listed FMCC as the first lienholder.

On October 28, 1988, certificates of title were issued for both vehicles. FMCC is listed as first lienholder on both titles and the certificates each list September 2, 1988, as the lien date.

On September 28, 1988, the debtors filed a joint petition in bankruptcy under chapter 7 of the Bankruptcy Code. The plaintiff was appointed trustee in the debtors' chapter 7 case. The plaintiff estimated that unsecured creditors would be paid approximately 33–36% of the value of their claims after administrative expenses were deducted. From the uncontroverted testimony of Brenda McFarland, it appears at all relevant times the total of the debtors' debts exceeded the total value of the debtors' assets. Schedules A and B filed with the debtors' chapter 7 petition show debts of $38,690.43 and assets of $23,920.

[*See* Record on Appeal, Tab 3, pp. 2–6].

In addition to the above facts, the transcript of the proceedings on December 1, 1989, reflects that the reason Darrell McFarland temporarily ceased using the Bronco sometime between September 2 and 15, 1988 was because he was concerned about putting too many miles on it in the event he had to return it if financing for both vehicles were not obtained [*see* Doc. 1, p. 48]. Likewise, Mark Cohen, a salesman at Gary Yeomans, testified that if the McFarlands' contracts were rejected by an acceptable lending institution, then Gary Yeomans would have to return the McFarlands' Nissan vehicle to them and, in turn, the McFarlands would have to return the two automobiles to Gary Yeomans [*see id.,*

pp. 63–4]. Cohen further testified that he was personally aware of similar scenarios occurring on at least two other occasions at Gary Yeomans when potential purchasers' contracts were rejected by acceptable lending institutions [*see id.*, p. 64].

### Argument

Based on the above facts, FMCC contends that the bankruptcy court erred when it ruled that the security interests held by it in the debtors' vehicles are preferential transfers and are therefore avoidable by the trustee. FMCC contends that it received no preferential transfers and asserts that the debtors and the personnel at Gary Yeomans agreed that a condition precedent to the sale of the two vehicles was that FMCC would finance the purchase of both vehicles. Thus, this condition was not fulfilled until September 15, 1988, the date financing was approved for both vehicles.[3] FMCC contends that its perfection of its security interests timely occurred within ten days of September 15, 1988, and that the transfers of the security interest would be deemed to have occurred on September 15, 1988, contemporaneously with the date the debtors incurred the debt.

Plaintiff responds that the bankruptcy court was correct in ruling that FMCC received preferential transfers of security interest in the debtors' automobiles. Specifically, plaintiff contends that the debtors acquired rights in the two vehicles on September 2, 1988, and granted security interests in the vehicles at that time. Because perfection of the security interests in the two vehicles did not occur until September 19 and 21, 1988, when the applications for title were submitted, the transfers of security interest are deemed to have taken place at that time pursuant to the provisions of 11 U.S.C. § 547(e)(2). Thus, plaintiff says that the debt incurred by the debtors was antecedent to the transfer of the security interests, creating preferences which he properly avoided.

### Law and Analysis

The elements of a preferential transfer are set forth in 11 U.S.C.A. § 547(b) (West 1979 & Supp.1990).[4] The primary issue on appeal is whether FMCC received a transfer of an interest of the McFarlands in property, *i.e.*, the security interests, "for or on account of an antecedent debt owed by the debtor before such transfer was made." *See* 11 U.S.C.A. § 547(b)(2) (West 1979). To resolve this issue, this court must ascertain whether the bankruptcy court was correct in determining that the date of the transfer for purposes of § 547 was September 2, 1988.

---

**3.** FMCC's position is somewhat inconsistent as to the date on which the attachable security interest in the automobiles was created. On one hand, FMCC says the attachable security interest was not created until September 14, 1988, the date on which the debtors obtained approval of financing on the second automobile [*see* Doc. 3, p. 10]; on the other hand, it says the contract was not created until September 15, 1988, when financing was approved on the second automobile [*see id.*, p. 11]. Because the bankruptcy court found that the date was September 15, 1988, this court agrees since this finding is not clearly erroneous. *In re: SIBC*, 809 F.2d at 331. Moreover, it makes no difference to the ultimate resolution of this case because if this court finds that the McFarlands had no rights in the collateral on September 2, 1988, but did so on either September 14 or 15, 1988, then it is undisputed that FMCC would have perfected its interest in these automobiles within ten days as required by § 547(e)(2).

**4.** (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C.A. § 547(b) (West 1979 & Supp.1990).

■ The timing of a transfer is governed by subsection (e) of § 547, which provides in pertinent part as follows:

(2) For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made—

(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time;

(B) at the time such transfer is perfected, if such transfer is perfected after such 10 days; or

.    .    .    .    .

(3) For the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred.

11 U.S.C.A. § 547(e)(2), (3) (West 1979 & Supp.1990). Legislative history reflects that the drafters intended the phrase "takes effect between the transferor and the transferee" to be synonymous with the term "attachment" as used in the context of security interests under Article 9 of the Uniform Commercial Code ("UCC"). *See* H.R.Rep. No. 595, 95th Cong. 1st Sess. 213 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6173.

■ Thus, in order for a transfer to have been made between Gary Yeomans and the McFarlands on September 2, 1988, this court must conclude, as did the bankruptcy court, that the McFarlands had "acquired rights" in the automobiles on that date so that they could convey attachable security interests in them. This court concludes otherwise.

In Tennessee, the attachability of security interests is governed by *Tennessee Code Annotated* § 47–9–203(1) (Supp.1990), which provides in pertinent part as follows:

(1) ... a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ... and

(b) the value has been given; and

(c) the debtor has rights in the collateral.

*Id.* On appeal, FMCC primarily contends that the McFarlands could not convey any attachable security interests in the automobiles to FMCC on September 2, 1988 because the McFarlands had no "rights in the collateral" as of September 2, 1988. FMCC also contends that a condition precedent to the creation of security interests in the two automobiles was not fulfilled until September 15, 1988. This court agrees with both prongs of FMCC's argument.

■ The phrase "rights in the collateral" is not defined in the UCC (codified at Title 47 of T.C.A.) or in the Bankruptcy Code. Although courts have held that "rights in the collateral" can be property rights which are less than full ownership rights, mere possessory rights in the collateral without more will not be enough to convey attachable security interests. *See* 2 J. White & R. Summers, *Uniform Commercial Code* § 24–6 at 322–23 (3 ed.1988).

In the instant case, this court concludes that the McFarlands only had, at most, mere possessory rights in the two automobiles prior to September 15, 1988. In fact, the purchase option contracts [*see* Exhibits A–B] did not expressly provide that the McFarlands would even have possessory rights in the two automobiles. To the contrary, those contracts provide in pertinent part as follows:

I understand and agree that during the course of my (our) purchase of a new car or truck from GARY YEOMANS FORD, that I may be provided with a substitute vehicle which is neither my old trade-in nor the particular vehicle I wish to purchase.

[*See id.*]. Thus, under the purchase option contracts, Gary Yeomans was not required to allow the McFarlands to drive off in either of the two new vehicles which they were attempting to purchase. Rather, Gary Yeomans could have provided them with two other vehicles while the parties were attempting to secure purchase money

for both vehicles from an acceptable lending institution [*see id.*]. Nevertheless, Gary Yeomans chose, for whatever reason, to allow the McFarlands to drive off in the vehicles on September 2, 1988, after the parties signed both the purchase option contracts and the installment contracts.[5] All parties understood, however, that in the event that financing was not secured for both vehicles, then the McFarlands would have to return the two vehicles to Gary Yeomans and, in turn, Gary Yeomans would return their trade-in vehicle to them. Thus, it was the understanding of the parties that the McFarlands had only possessory rights to these vehicles until they were able to obtain financing for both automobiles. This understanding nearly reached fruition on September 15, 1988, when the McFarlands and Gary Yeomans were preparing to re-exchange vehicles, all parties believing that financing on the Bronco would not be obtained [*see infra*, p. 4]. Under these circumstances, therefore, this court fails to see how the debtors had anything more than naked possessory rights in the two automobiles before they obtained financing on September 15, 1988. Because the debtors had nothing more than mere possessory rights in the collateral, the court likewise concludes that they had acquired no rights in the collateral so that they could convey attachable security interests to FMCC.

■ Moreover, the court concludes that FMCC should prevail on appeal based on its position that a condition precedent to the formation of an attachable security interest was not satisfied until September 15, 1988, the date on which financing was approved on the Bronco. This conclusion is factually supported by the following provision in the purchase option contract [*see* Exhibits A–B]:

> As an alternate to the above described means of exercising this option, Buyer and Seller may execute a retail install-ment sales contract subject to acceptance of such contract by a lending institution acceptable to Seller and payment in cash or equivalent, subject to the aforementioned conditions, any and all cash down payment required under such retail installment sales contract and delivery to and acceptance of the said vehicle by Buyer. Seller agrees to refund to Buyer the purchase price of this option only if Buyer is unacceptable to such lending institutions for the credit amount requested as recorded in the space provided below if applicable.

[*See id.*]. Pursuant to this provision, the parties executed the two installment contracts [*see* Exhibits 1–2]. As provided for in the purchase option contracts, the two installment contracts were "subject to acceptance of such contract by a lending institution acceptable to Seller ..." The second installment contract was not accepted by such a lending institution until September 15, 1988.

■ The court finds that the acceptance by an appropriate lending institution on September 15, 1988, was a condition precedent, which has been defined as follows:

> An event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.

*Covington v. Robinson*, 723 S.W.2d 643, 645 (Tenn.Ct.App.1986) (quoting *Restatement Second, Contracts*, § 244). As the *Covington* court further explained:

> A conditional contract is a contract whose very existence and performance depends upon the happening of some contingency or condition expressly stated therein ...

*Id.* (quoting *Real Estate Management v. Giles*, 41 Tenn.App. 347, 293 S.W.2d 596, 599 (1956)). No liability under the contract attaches to either party until such condition

---

5. Plaintiff has attributed some significance to the fact that Gary Yeomans allowed the McFarlands to take possession of the two new automobiles with no mileage restrictions or driving limitations upon their use of these automobiles. This fact does not, however, lend support to plaintiff's position that the McFarlands had something more than mere possessory interest in the automobiles. Rather, this fact indicates only the extent of the McFarlands' possessory rights. In other words, this fact indicates that the McFarlands had full possessory rights in the automobiles rather than some sort of limited possessory rights in them.

precedent is fulfilled. *Id.* (citing *Strickland v. City of Lawrenceburg,* 611 S.W.2d 832 (Tenn.Ct.App.1981)). In other words, under Tennessee law, contracts subject to a condition precedent do not come into being unless the condition is performed. *Guilbert v. Phillips Petroleum Company,* 503 F.2d 587, 590 (6th Cir.1974). *Accord First National Bank of Santa Fe v. Quintana,* 105 N.M. 410, 733 P.2d 858, 3 U.C.C.Rep. Serv.2d 773 (1987) (Where the purchase agreement between buyer and seller contained a condition precedent (payment) which was never performed by purchaser, as a matter of law the contract was never consummated; thus, naked possession by the buyer provided an insufficient acquisition of rights in the collateral to which the lender bank's security interest might attach. As a matter of law, the bank had neither a valid security interest in the collateral nor a claim against the seller's property).

Under Tennessee law, the court concludes therefore that the contracts between these parties were subject to a condition precedent which was not performed until September 15, 1988. Thus, the contracts did not fully come into existence until that time and no attachable security interest could be conveyed prior to that time. Although the purchase option contracts and the installment contracts may have conferred certain limited rights and obligations on the parties on September 2, 1988, the existence of the condition precedent prevented full rights and obligations being conferred on the parties until September 15, 1988. More to the point, the condition precedent prevented the McFarlands from having any rights in the collateral whereby they could convey attachable security interests before September 15, 1988.

Finally, to hold otherwise would require a car dealership such as Gary Yeomans to apply for the certificate of title prior to a point in time in which it could advise the Motor Vehicle Division for the State of Tennessee who the lienholder of record is. *See* T.C.A. § 55–3–103(3) (Supp.1990). This court cannot, under these circumstances, reach such an inequitable result.

Order accordingly.

## ORDER

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED that the judgment entered by the bankruptcy court on April 6, 1990 [*see* Record on Appeal, Tab 2] be, and the same hereby is, REVERSED whereby the trustee's complaint is DISMISSED.