**In re Flora J. Thomas JEANS and Derrell T. Jeans, Debtors.**

**No. 04–24746–L.**

United States Bankruptcy Court, W.D. Tennessee, Western Division.

June 28, 2005.

Joseph A. Livesay, Sr., Law Office of Joseph A. Livesay, Sr., Memphis, TN, for Debtors.

Michael P. Coury, Farris, Mathews, Branan, Bobango, Hellen, Memphis, TN, for trustee.

## ORDER GRANTING MOTION FOR TURNOVER

JENNIE D. LATTA, Bankruptcy Judge.

BEFORE THE COURT is the motion of George W. Stevenson, Chapter 7 Trustee (the "Trustee"), for turnover of title to a vehicle. The court heard oral argument on March 3, 2005. In addition to seeking turnover of title, the motion seeks to avoid the lien of Capital One Auto Finance ("Capital One") as a preferential transfer pursuant to 11 U.S.C. § 547(b). The Trustee asserts that the lien may be avoided because it was not perfected until more than twenty days after Flora Jeans (the "Debtor") received possession of the vehicle. Capital One counters that the lien may not be avoided because it was perfected within ten days following the Debtor's acquisition of rights in the collateral. For the following reasons, the motion of the Trustee will be granted. This is a core proceeding. 28 U.S.C. § 157(b)(2)(E) and (F).

## I. FACTS

The material facts are not in dispute. On February 7, 2004, the Debtor went to Chuck Hutton Chevrolet Company, Inc. ("Chuck Hutton") with the intention of purchasing an automobile. She selected a 2003 Pontiac Grand Prix, settled on a purchase price of $15,154.91 (including sales tax), made a $1,000.00 down payment, and executed a Retail Installment Contract and Security Agreement (the "Contract") and Immediate Delivery Agreement (the "Agreement"). The Agreement provides in pertinent part as follows:

Customer acknowledges the Contract is expressly contingent upon the occurrence of the following conditions precedent:

● Dealer and financial or lending institution being able to verify all information provided by Customer in the Contract or in the loan application for the Contract as true and accurate;

● Dealer and financial or lending institution being able to verify that Customer currently has comprehensive and collision insurance coverage that covers the vehicle;

● All checks, money orders, or other forms of down payment presented by Customer are negotiable by Dealer, and are honored by the financial institutions upon which they are drawn;

● The financial institution or lending institution to which the Contract is tendered in fact accepts and purchases the Contract from Dealer.

Prior to these contingencies occurring, Dealer is, nonetheless, allowing Customer to take immediate possession of the vehicle. In the event that any one or more of these conditions are not met, the Contract is null and void, and the customer is obligated to immediately return the vehicle to Dealer.

Pursuant to the Agreement, the Debtor received possession of the vehicle on February 7, 2004, and has had possession of it since that date. On February 7, 2004, Chuck Hutton assigned the Contract to Capital One. The last of the conditions specified in the Agreement to occur was the acceptance of the contract by Capital One, which occurred on March 12, 2004. Capital One applied for the certificate of title on March 15, 2004, and a certificate of title noting the lien was issued by the State of Tennessee on March 16, 2004. The certificate of title indicates that the date of acquisition was February 7, 2004, and the date of the lien was March 15, 2004.

The Debtor and her husband filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on March 26, 2004. George W. Stevenson was appointed case trustee on March 31, 2004, and filed his motion for turnover on August 25, 2004.

## II. ANALYSIS

The Bankruptcy Code entitles a trustee to obtain the turnover of property he may use, sell, or lease. Bankruptcy Code § 542(a) provides:

Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a). The Trustee asserts that Capital One is obligated to turnover the title to the Debtor's vehicle because the Trustee may sell the vehicle for the

benefit of the estate free of the lien of Capital One. The Trustee asserts that he is entitled to avoid the lien of Capital One as a preferential transfer because the granting of a security interest by the Debtor occurred within the 90 days preceding the filing of the Debtors' bankruptcy petition, but was not perfected until more than 20 days after the Debtor took possession of the vehicle.[1] Capital One asserts that the date on which the Debtor took possession of the vehicle is immaterial; it argues that, as the result of the Agreement, the Contract did not come into existence until Capital One accepted and purchased the Contract from the Dealer on March 12, 2004, a mere 3 days prior to perfection.

■ In general, a trustee may avoid any transfer of an interest of a debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of [title 11];

(B) such transfer had not been made;

(C) such creditor received payment of such debt to the extent provided by the provisions of [title 11].

11 U.S.C. § 547(b). The Trustee must establish each of these elements by a preponderance of the evidence. 11 U.S.C. § 547(g); *In re Fred Hawes Organization, Inc.*, 957 F.2d 239, 242 (6th Cir.1992). Capital One has the burden of establishing any exception upon which it relies. 11 U.S.C. § 547(g). At issue in this case is whether the Trustee has established that a transfer was made on account of an antecedent debt. There is no dispute that the Trustee has established the remaining elements of a preferential transfer. In order to establish a transfer on account of an antecedent debt, the Trustee must show that the debt was incurred before the allegedly preferential transfer in question. *In re Jones Truck Lines, Inc.*, 130 F.3d 323, 329 (8th Cir.1997).

The creation of a security interest is a transfer for purposes of the Bankruptcy Code. 11 U.S.C. § 101(54). Pursuant to the Contract, the parties intended that a security interest be created simultaneously with the obligation to make payments. There was a delay, however, between the signing of the Contract and the perfection of the security interest. The Trustee asserts that as a result of this delay, the transfer of the security interest did not occur, for purposes of the Bankruptcy Code, until more than 20 days after the creation of the obligation. Therefore, according to the Trustee, the transfer of the security interest did not occur until the security interest was perfected (as discussed more fully below), and thus was made on account of an antecedent debt.

Capital One asserts that the obligation did not arise and transfer of the security interest did not occur until satisfaction of the conditions set out in the Agreement; that perfection of the security interest oc-

---

[1] Capital One did not object to the Trustee proceeding by motion rather than adversary proceeding to avoid this transfer.

curred within 10 days thereafter; and thus, that the transfer of the security interest occurred simultaneously with the creation of the obligation.

This case turns on two questions: (1) when was the debt created? and (2) when did the transfer of the security interest take place?

## A. Creation of Debt

■ One document, the Contract, served both to create the Debtor's obligation to pay for the vehicle and to create the security interest in the vehicle purchased by the Debtor. A second document, the Agreement, specified certain conditions precedent to the Contract. These documents were signed on the same day and must be read together. If any of the conditions specified in the Agreement had failed, the Contract could have been avoided by Chuck Hutton. Under the provisions of the Agreement, in that event, the Debtor would have been obligated to return the vehicle.

In this case, however, none of the conditions failed. The first question, then, is when did the obligation of the Debtor to pay for the vehicle arise under the Contract? Was the Contract effective as of the date of signature, such that a debt was owed by the Debtor and a security interest created on February 7, 2004? Or did the Contract not become effective until it was accepted by Capital One on March 12, 2004?

There are significant indicators that the parties intended that the Contract would become effective as of the date that it was signed. First, no other effective date is specified in the Contract or the Agreement other than the date of signing. Second, the calculation of interest in the Contract assumes an effective date of February 7, 2004, the date of signing. Third, the Contract was accepted by Chuck Hutton on February 7, 2004. Fourth, the assignment of the Contract to Capital One by Chuck Hutton is separately signed and dated February 7, 2004. Fifth, the date of acquisition specified in the Certificate of Title is February 7, 2004.

There is little question that the Debtor became obligated to Chuck Hutton when she received possession of the vehicle on February 7, 2004. On that date, she became obligated to either pay for the car or return it in substantially the same condition she received it, if one or more of the conditions specified in the Agreement failed. The conditions set out in the Agreement were intended to benefit Chuck Hutton. Only incidentally did they benefit the Debtor. At no time could the Debtor have simply changed her mind and returned the car to Chuck Hutton without obligation. Similarly, Chuck Hutton became obligated under the Contract from the time of its acceptance of the Contract. It could not have changed its mind and demanded the return of the vehicle *unless* one of the conditions specified in the Agreement failed. Until one of the conditions failed, the Debtor was obligated to pay for the vehicle and Chuck Hutton was obligated to allow the Debtor to retain possession of the vehicle.[2]

From these circumstances, the court concludes that the parties intended that the Contract would come into *existence* upon acceptance, not upon fulfillment of the conditions precedent. Pursuant to the Agreement, performance by the parties under the Contract would be excused upon failure of any of the conditions specified in the Agreement. If the parties had intended that no contract come into existence

2. Although no bill of sale was made a part of the record in this case, the Contract indicates that "the Vehicle *is sold* in its present condition ...." (emphasis added).

until the conditions occurred, then interest should not have begun to accrue on the Debtor's obligation to pay for the vehicle until a contract was formed. The obligation of the Debtor to pay for the vehicle arose on February 7, 2004.

### B. Transfer of the Security Interest

■ The Bankruptcy Code specifies when a transfer is made for purposes of determining whether a preferential transfer has occurred. In relevant part, section 547(e) provides:

(2) For purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made—

(A) at the time such transfer takes effect between the transferor and transferee, if such transfer is perfected at, or within 10 days after, such time, except as provided in subsection [547](c)(3)(B);

(B) at the time such transfer is perfected, if such transfer is perfected after such 10 days; or

(C) immediately before the date of the filing of the petition, if such transfer is not perfected at the later of—

(i) the commencement of the case; or

(ii) 10 days after such transfer takes effect between the transferor and the transferee.

(3) For purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred.

Two exceptions are built into this subsection. First, for all purposes of the section, a transfer is not made until the debtor has acquired rights in the property. Second, for purposes of determining when a transfer that is subject to perfection occurs, some or all the exception for purchase-money security interests overrides some or all of section 547(e)(2)(A). Section 547(c)(3) provides:

(c) The trustee may not avoid under this section a transfer—

(3) that creates a security interest in property acquired by the debtor—

(A) to the extent such security interest secured new value that was—

(i) given at or after the signing of a security agreement that contains a description of such property as collateral;

(ii) given by or on behalf of the secured party under such agreement;

(iii) given to enable the debtor to acquire such property; and

(iv) in fact used by the debtor to acquire such property; and

(B) that is perfected on or before 20 days after the debtor receives possession of such property.

11 U.S.C. § 547(c)(3). The reference to section 547(c)(3) was added to section 547(e)(2)(A) in the Bankruptcy Reform Act of 1994.

In order to determine when the transfer of the security interest in the Debtor's vehicle was made for purposes of the Bankruptcy Code, a number of questions must be considered. First, when was the transfer a true security interest effective between the transferor and the transferee? Second, when was that transfer perfected? Third, when did the Debtor acquire rights in the property transferred? Fourth, how are sections 547(e)(2)(A) and 547(c)(3) to be read together?

### 1. The transfer took effect between the Debtor and Chuck Hutton on February 7, 2004.

Section 547(e)(2)(A) makes reference to the time a transfer takes effect between the transferor and the transferee. Section 547(e) specifies that for purposes of section

547, "a transfer of … property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." 11 U.S.C. § 547(e)(1)(A). With respect to section 547, the Supreme Court has ruled that "[w]hat constitutes a transfer and when it is complete is a matter of federal law." *Barnhill v. Johnson,* 503 U.S. 393, 397, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). No guidance is provided, however, by the Bankruptcy Code for determining when a transfer takes effect, and "in the absence of any controlling federal law," when a transfer is effective between a transferor and transferee is determined pursuant to state law. *Id.* The transfer in question here is the transfer of a security interest from the Debtor to Chuck Hutton. Transfer of title from Chuck Hutton to the Debtor is not required. The Tennessee Code makes this clear:

> Title of goods cannot pass under a contract for sale prior to their identification to the contract (§ 47–2–501), and unless otherwise explicitly agreed the buyer acquires by this identification a special property as limited by Chapters 1–9 of this title. *Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.* Subject to these provisions and to the provisions of the chapter on Secured Transaction (Chapter 9 of this title), title to goods passes from the seller to the buyer in any manner and on any condition explicitly agreed to by the parties. (emphasis added).

Tenn.Code Ann. § 47–2–401(1). The Tennessee Code further provides that identification occurs when the contract is made if it is for the sale of goods already existing and identified. Tenn.Code Ann. § 47–2–501(1)(a). At that time, the buyer obtains a special property and an insurable interest in the goods identified even though the goods may be non-conforming and the buyer has the option to return or reject them. Tenn.Code Ann. § 47–2–501(1).

Both the Contract and the Agreement identify the vehicle purchased by the Debtor. It was a used vehicle, and thus in existence when the Contract and Agreement were signed. Thus, the vehicle was "identified to the contract" when the Contract was made. Upon delivery of the vehicle to the Debtor pursuant to the Contract, reservation of title by Chuck Hutton was in effect reservation of a security interest. The Contract itself evidences the parties' intention that transfer of the security interest be contemporaneous with the obligation to make payments.

Legislative history indicates that the phrase "time a transfer takes effect between the transferor and the transferee" as used in section 547(e)(2)(A) was intended to be synonymous with the term "attachment" as used in Article 9 of the Uniform Commercial Code. *See* H.R. Rep. 95–595, 95th Cong., 1st Sess. 212, 213 (Sept. 8, 1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6330. Article 9 of the Uniform Commercial Code ("UCC") was substantially amended in 2000. As amended, the UCC provides that, "a security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment." Tenn.Code Ann. § 47–9–203(a). Further,

> [A] security interest is enforceable against the debtor and third parties with respect to the collateral only if
>
> (1) value has been given;
>
> (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

(3) one (1) of the following conditions is met:

(A) the debtor has authenticated a security agreement that provides a description of the collateral . . . .

Tenn.Code Ann. § 47–9–203. Value was given when Chuck Hutton delivered the vehicle to the Debtor pursuant to her promise to pay. The Debtor authenticated a security agreement that provided a description of the collateral when she signed the Contract. *See* Tenn.Code Ann. § 47–9–102(7) (a signature is one method of authentication). The Debtor had rights in the collateral or the power to transfer rights in the collateral to a secured party when she received possession of the vehicle pursuant to the Contract. Delivery of the vehicle to the Debtor pursuant to a contract of sale conferred upon the Debtor a special property and an insurable right. The retention of title by a seller after delivery of goods identified to a contract is the retention of a security interest. Articles 2 and 9 of the UCC must be read together. When read together, it is clear that the transfer of the security interest to Chuck Hutton (or retention of the security interest by Chuck Hutton) was effective as between the Debtor and Chuck Hutton on the day the vehicle was delivered pursuant to the Contract, February 7, 2004.

**2. The transfer of the security interest from the Debtor to Chuck Hutton was perfected on March 15, 2004.**

Under Tennessee law, "[g]oods become covered by a certificate of title when a valid application for the certificate of title and the applicable fee are delivered to the appropriate authority." Tenn.Code Ann. § 47–9–303(b). In order to perfect the transfer of a security interest in a motor vehicle, the existing certificate of title, if any, and an application for a certificate of title containing the name and address of the holder of the security interest must be delivered to the division of motor vehicles or the county clerk, together with the required fee. Tenn.Code Ann. § 55–3–126(b)(1). The security interest is perfected as of the date of delivery to the county clerk or the division of motor vehicles. Tenn.Code Ann. § 55–3–126(b)(2).

The parties have stipulated that application for issuance of a certificate of title noting the lien of Capital One was made on March 15, 2004. Chuck Hutton made application for issuance of the certificate of title on behalf of its assignee, Capital One. The security interest transferred by the Debtor to Chuck Hutton was perfected on March 15, 2004.

**3. The Debtor acquired rights in the collateral when she received possession of the vehicle pursuant to the Contract.**

We have seen that acquisition of rights in the collateral by the debtor is one of the requirements for attachment of a security interest. Section 547(e)(3) together with the *section 547(c)(5) exception*, were specifically intended to overrule federal cases holding that the transfer of a security interest in accounts occurs when a financing statement is filed covering accounts, not when individual accounts come into existence. *See* S. Rep. 95–989, 95th Cong., 2d Sess. 87–88 (July 14, 1978). *See also Vern Countryman*, "The Concept of a Voidable Preference in Bankruptcy," 38 Vand. L.Rev. 713, 790–801 (1985). Section 547(e)(3) was designed to prevent a secured lender with a security interest in accounts and inventory from claiming that the transfer of accounts and inventory occurs when a financing statement is filed (outside the preference reach-back period), rather than when accounts and inventory are acquired by the debtor (within the preference reach-back period), and thus

avoiding a preference attack by a trustee in bankruptcy. Transfer of after-acquired property occurs when the property is acquired by the debtor, but may be saved from avoidance by the no-improvement-in-position exception of section 547(c)(5). Section 547(e)(3) is aimed at situations in which a debtor has no interest in collateral whatsoever, either because inventory has not yet been acquired or an account has not come into existence as the result of a sale. Section 547(e)(3) was not intended to require evaluation of the type of interest held by a debtor in collateral, the type of analysis urged by Capital One in this case. As we have seen, the Debtor did acquire a special property and an insurable interest in the vehicle when it was delivered to her pursuant to the Contract. The Debtor acquired rights in the collateral on February 7, 2004.

#### 4. Section 547(e)(2)(A) as amended incorporates section 547(c)(3) in its entirety.

Section 547(e)(2)(A) was amended in 1994 to create an exception to that subsection for loans covered by the section 547(c)(3) exception. In order to understand how these sections are to be read together, it is important to consider the history and evolution of the section 547(c)(3) exception.

The UCC describes two types of purchase-money security interests. The distinction is very clear in pre-revision Article 9, where it was said:

A security interest is a "purchase money security interest" to the extent that it is

(a) taken or retained by the seller of the collateral to secure all or part of its price; or

(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to

acquire rights in or the use of collateral if such value is in fact so used. U.C.C. § 9–107 (1994) (amended 2000). Even after the 2000 revision, the distinction remains. A purchase-money security interest in goods is one to the extent that the goods are purchase-money collateral with respect to that security interest. Tenn.Code Ann. § 47–9–103(b)(1). "Purchase-money collateral" is a defined term, meaning goods or software that secure a "purchase-money obligation," also a defined term. Tenn.Code Ann. § 47–9–103(a)(1). A "purchase-money obligation" means "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Tenn.Code Ann. § 47–9–103(a)(2). The two types of purchase-money security interests are those retained by a seller and those granted to an existing lender.

In legislative history to the Code of 1978, section 547(c)(3) is described as an exception "for enabling loans in connection with which the debtor acquires the property that the loan enabled him to purchase after the loan is actually made." H.R. Rep. 95–595, 95th Cong. 1st Sess. 373 (Sept. 8, 1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6329. Professor Vern Countryman has left a valuable explanation of the history of section 547(c)(3) in "The Concept of a Voidable Preference," 38 Vand. L.Rev. 713, 776–81 (May, 1985). There he explains that the Gilmore Committee of the National Bankruptcy Conference recommended an exception to the preference concept not for a security interest retained by a seller, but for a security interest taken by an enabling lender (the lender described in Pre–Revision UCC § 9–107(b)). It was felt that this protection was needed for the enabling lender because in the typical enabling transaction, a debtor acquires property to which a se-

curity interest attaches *after* an enabling loan is made. Without the enabling loan exception, the attachment of a security interest in property acquired with proceeds of an enabling loan would be a transfer on account of an antecedent debt, and thus potentially a preferential transfer. The seller who retains a security interest in property sold by him was not thought to need this protection because, unless he delays perfection, the transfer of the security interest coincides with the creation of the debt, and there is, therefore, no preferential transfer.

Over time, for purposes of the application of section 547(c)(3), courts have not distinguished between purchase-money security interests retained by a seller and purchase-money security interests granted to an enabling lender. *See, e.g., In re Davis,* 734 F.2d 604 (11th Cir.1984) (applying section 547(c)(3) to a seller retained purchase money security interest); *In re Murray,* 27 B.R. 445, 448 (Bankr. M.D.Tenn.1983) (also applying section 547(c)(3) to a seller-retained purchase-money security interest). Both types of purchase-money loans are now treated under the preference exception, even though an exception should not be needed for the security interest retained by a seller. The Bankruptcy Reform Act of 1994 was accompanied by an extensive section-by-section analysis. The description of section 203, entitled "Perfection of Purchase-money Security Interests," provides:

> Section 547(c)(3) of the Bankruptcy Code provides that a trustee may not avoid the perfection of purchase-money security interest as a preference if it occurs within 10 days of the debtor receiving possession of the property. This section [section 203 of the Bankruptcy Reform Act] conforms bankruptcy law practices to most states' practices by granting purchase-money security lend-

ers a 20–day period in which to perfect their security interest.

140 Cong. Rec. H 10764 (Oct. 4, 1994). These comments are interesting for a number of reasons. First, the title of the section makes reference to purchase-money security interests, not the more narrow "enabling loan exception." Second, the first sentence of the description describes section 547(c)(3) as related to purchase-money security interests, not merely enabling loans. Third, the comments indicate that concern had shifted from the *transfer of the security interest* as potentially preferential to *perfection of the security interest* as a transfer that might be avoided. Fourth, the final sentence of the description indicates the intention that all purchase-money lenders be given a 20–day period to perfect their security interest.

Capital One's reading of section 547(e)(2)(A) and section 547(c)(3) is inconsistent with the intention expressed in legislative history that all purchase-money security interests be analyzed and treated the same for preference purposes under the Bankruptcy Code. Capital One suggests either (i) that transfer of a purchase-money security interest is protected from preference attack if the security interest is perfected at or within 10 days after the security interest attaches *or* on or before 20 days after the debtor receives possession of the acquired property; or (ii) that "receives possession" and "acquires rights in the collateral" are synonymous.

■ Not only are these readings unnecessarily complex and inconsistent with the legislative history explaining the 1994 amendment, they are also inconsistent with the history of the section 547(c)(3) exception. That exception, as originally enacted, protected security interests (securing enabling loans) that were "perfected before 10 days after such security interest attaches." Pub.L. No. 95–598, 92 Stat.

2549. In 1984, that section was amended to protect security interests "perfected 10 days after the debtor receives possession of such property." Pub.L. No. 98–353, 98 Stat. 353. The period of time for perfection was extended from 10 to 20 days in the 1994 amendments. The reasons for the amendments are explained by *Collier*:

> By establishing a uniform measurable date to trigger the running of the 20–day period under 11 U.S.C. § 547(c)(3), Congress has eliminated the possibility of inconsistent decisions based on the vagaries of state law. State law varies widely in defining when a security interest attaches.

5 *Collier on Bankruptcy*, ¶ 547.04, (L. King 15th ed. revised). The substitution of possession for attachment in section 547(c)(3) clearly signals that the two concepts are distinct, and thus that the debtor's receipt of possession of property is not synonymous with the debtor acquiring rights in the property. The distinction suggests that possession literally means possession and nothing more.[3] A debtor's receipt of possession of property acquired by the debtor is a fairly easily verifiable fact, whereas acquisition of rights in collateral can be a more troublesome concept. *Collier* also points out that following the 1984 Amendment, one potential ambiguity remained as the result of Congress's failure to conform section 547(e)(2) to the change made in section 547(c)(3). *Id.* That remaining ambiguity was resolved with the amendment of 1994. Section 547(e)(2)(A) now incorporates section 547(c)(3), making it the exclusive measure of perfection of a purchase-money security interest. Transfer of a purchase-money security interest (of either type) is made for purposes of the Bankruptcy Code when the transfer is effective between the transferor and transferee if it is perfected on or before 20 days after the debtor receives possession of the property.

In the present case, a debt arose from the Debtor to Chuck Hutton on February 7, 2004, and transfer of a security interest was effective between the Debtor and Chuck Hutton on that date. Further, the Debtor received possession of the vehicle acquired by her and securing the obligation to Chuck Hutton on February 7th. For purposes of the Bankruptcy Code, however, the transfer of the security interest will be deemed to have occurred at the time of perfection (March 15, 2004) because the security interest was not perfected on or before 20 days after the Debtor received possession of the vehicle. Thus, the transfer occurred after the creation of the obligation and thus is a transfer on account of an antecedent debt.

■ Even if section 547(e)(2)(A) were read as Capital One suggests, Capital One would not prevail. A debt arose on February 7, 2004, when the Debtor signed the Contract. Even if, as Capital One suggests, the Debtor did not obtain rights in the collateral and thus could not transfer a security interest in the collateral until the Contract was accepted by Capital One, the transfer of that security interest on March 12th would have been on account of an antecedent debt. The fact that perfection occurred only 3 days after Capital One accepted the Contract means, under Capital One's reading, that the transfer of the security interest was made when the transfer was effective between the transferor and the transferee rather than at perfection. It does not mean that the transfer of the security interest relates back to the creation of the obligation.

---

**3.** Nothing more is required because the concept of possession arises in connection with the other requirements of section 547(c)(3).

Transfer of a security interest on March 12th to secure an obligation that arose on February 7th is a transfer on account of an antecedent debt, and the Trustee would prevail unless one of the preference exceptions applies.

## C. The *McFarland* Decision

Rather than attempting to establish that one of the preference exceptions applies to its transaction, Capital One relies upon the decision of the district court in *In re McFarland*, which held under the facts of that case that a retail installment contract did not fully come into existence until a certain condition was performed. *In re McFarland*, 131 B.R. 627 (E.D.Tenn.1990), *aff'd* 943 F.2d 52 (6th Cir.1991).

The facts in *McFarland* are very similar to the facts in this case and require careful attention. The debtors in that case owned a 1987 Nissan automobile encumbered by a substantial lien. The debtors found that they needed two cars. They decided they would trade the Nissan for two vehicles provided they could arrange financing of both vehicles with payments that were approximately the same as the payments on the Nissan. The debtors spoke with a salesman at a Ford dealership and agreed to purchase two used vehicles on condition that they obtain financing through Ford Motor Credit Corporation ("FMCC"). The debtors executed a "Car Buyer's Offer and Purchase Option Contract" for each of the vehicles. The agreement stated the price the debtors would pay if they exercised their option to purchase. To exercise their option, the debtors would pay either the cash sales price for the vehicles or would execute a retail installment sales contract. The debtors executed these agreements for each of the vehicles before

they left the dealership, and the contracts were accepted by an agent of the dealership. The debtors and the representative of the dealership orally agreed that the installment contracts were subject to FMCC agreeing to finance both vehicles. The debtors were allowed to take both vehicles home with them. No mileage restrictions or driving limitations were placed on their use of the vehicles.

FMCC initially agreed to finance only one of the vehicles, but eventually after further negotiations agreed to finance both. At that point, the dealership assigned the contracts to FMCC, 13 days after the debtors received possession of the vehicles. Thereafter, the dealership submitted applications for Tennessee certificates of title on the vehicles. One application was submitted 17 days after the debtors received possession of the vehicles, and the other was submitted 19 days later.[4] Both applications listed FMCC as the first lienholder. When certificates of title were issued for the vehicles, they listed the date of possession as the lien date. The debtors filed a joint Chapter 7 petition 26 days after they took possession of the vehicles.

The bankruptcy court held that the transfer of security interests in the two vehicles were preferential on the basis that the condition that the debtors obtain financing for both vehicles was a condition to the right of performance under the retail installment contracts, but not a condition to the formation of the contracts, and further that the debtors acquired sufficient rights in the collateral to enable them to transfer security interests when they received possession of the vehicles that were identified in the contract for purchase.

**4.** *McFarland* was decided before the reachback period for perfection of transfers of purchase-money security interests was extended from 10 to 20 days for purposes of the Bankruptcy Code.

The district court reversed, holding that a condition precedent to the formation of the contracts for the sale of the two vehicles was FMCC's agreement to finance both vehicles. As a result, the court held that the debtors did not acquire rights in the automobiles when they received possession of them. Because the court found that the retail installment contracts did not come into existence until the condition that the debtors obtain financing for both vehicles was fulfilled, the debtors obtained mere possessory rights in the vehicles and thus were not able to convey attachable security interests. *McFarland*, 131 B.R. at 633. The court of appeals affirmed the decision of the district court and adopted its opinion. *McFarland*, 943 F.2d at 52.

There are a number of points that distinguish *McFarland* from the present case. There are factual differences between the cases. The McFarlands received possession of the vehicles pursuant to "purchase option contracts," not "immediate delivery agreements." The purchase option contracts gave the debtors in that case the *option* to purchase the automobiles. The option could be exercised either by paying the cash purchase price or by executing a "retail installment sales contract subject to acceptance of such contract by a lending institution acceptable to Seller ...." This language clearly indicates that the *option to purchase* could not be exercised unless and until the debtors were able to obtain financing of their purchase from a lender acceptable to the dealer. In contrast, the Debtor in the present case *purchased* a vehicle from Chuck Hutton upon the condition that certain events occur, all of which did in fact occur.

Second, the purchase option contracts in *McFarland* provided that the debtors would be provided substitute vehicles while they were waiting for approval of their financing, but expressly indicated that the substitute vehicles need not be either their old trade-ins nor the vehicles they wished to purchase. The district court pointed out that, pursuant to the contract, the dealer could have provided them with any two vehicles while they were attempting to secure financing. The Agreement in this case is not so broad. It identifies the vehicle purchased by the Debtor and specifically provides that she is permitted to take possession of that vehicle.

A third apparent factual difference between the cases concerns the retail installment contracts themselves. The last comment by the district court in support of its conclusion concerns the inability of the dealer to apply for a certificate of title prior to the point in time when it could advise the motor vehicle division who the lienholder would be. The recitation of facts provided in the opinion indicates that the debtors executed retail installment contracts on the day that they executed the purchase option contracts. The opinion also indicates that the retail installment contracts were accepted by an agent of the seller on that day. The language of the retail installment contracts, however, is not provided in the opinion. One wonders whether the contracts were executed in blank, without the name of a lender provided, or whether the language of the contract differed dramatically from that of the Contract executed by the Debtor in this case. Under the Debtor's Contract, there is no question that the lienholder was Chuck Hutton, its successors and assigns. Nothing prevented Chuck Hutton from applying for the issuance of a certificate of title noting itself as first lienholder. The Contract was and is an agreement between the Debtor and Chuck Hutton. Chuck Hutton assigned its rights under the Contract to Capital One, but there is no direct agreement between the Debtor and Capital One. Had one or more of the conditions set out in the Agreement failed, Chuck

Hutton could have declared the Contract null and void pursuant to the Agreement. Conversely, once the conditions were fulfilled, nothing would have prevented Capital One from having the certificate of title reissued showing itself as first lienholder. Finally, of course, Chuck Hutton and Capital One could have protected themselves by delaying delivery of the vehicle until they were ready to enter into an agreement with the Debtor.

There are also legal differences between the two cases. Most importantly, *McFarland* was decided before the 1994 amendments to the Bankruptcy Code, which added the exception to section 547(e)(2)(A) making perfection of purchase-money security interests an exception to that section, and which extended the reach-back period for perfection of transfers of purchase-money security interests from 10 to 20 days at section 547(c)(3)(B). As the result of these amendments, it is clear that the transfer of a purchase-money security interest is made when it becomes effective between the transferor and transferee if the transfer is perfected on or before 20 days after the debtor receives possession of the property. Attachment is no longer a triggering event for perfection; possession is the triggering event. The court need not scrutinize whether "mere possession" was sufficient to enable the Debtor to convey an attachable security interest. Rather, in the case of a purchase-money security interest, the court need only look to when the Debtor received possession of the collateral pursuant to a contract for sale and signed security agreement, and when the transfer was perfected, to determine when the transfer is deemed to have been made for purposes of the Bankruptcy Code.

A second legal difference between the two cases concerns the question of when a debt was owed. In the *McFarland* case, there is no discussion about when the retail installment contracts became effective or when the debtors became obligated to purchase and pay for the vehicles. Because the retail installment contracts in that case were subject to purchase options, the debtors were in fact under no obligation to purchase until they were able to exercise the options to purchase by paying the cash price for the vehicles or by providing retail installment contracts acceptable to a lender approved by the dealer. Even though the debtors signed retail installment contracts on the day they executed the purchase option contracts, they could not exercise the options to purchase until the contracts were accepted by a lender acceptable to the dealer. In this case, the Debtor became obligated to purchase, and indeed did purchase, her vehicle when she signed the Contract.

Third, despite *McFarland's* rather broad declaration that "under Tennessee law, contracts subject to a condition precedent do not come into being unless the condition is performed," the law actually appears to be more nuanced and confused. *McFarland* relied upon *Guilbert v. Phillips Petroleum Company*, 503 F.2d 587, 590 (6th Cir.1974). *Guilbert* held that "[u]nder Tennessee law, contracts subject to a condition precedent do not come into being unless the condition is performed." *Guilbert*, 503 F.2d at 590 (citing *Real Estate Management, Inc. v. Giles*, 41 Tenn. App. 347, 293 S.W.2d 596, 599 (1956)). *Real Estate Management* held that "[a] conditional contract is a contract whose very existence and performance depends upon the happening of some contingency or condition expressly stated therein, and in the instant case … liability … did not attach because the conditions prerequisite to liability were never fulfilled." (emphasis added). *Real Estate Management*, 293 S.W.2d at 599 (citing *Mack v. Hugger Bros. Const. Co.*, 10 Tenn.App. 402, 1929

WL 1657 (1929); 17 C.J.S., Contracts, §§ 338, 456, pp. 792, 937–938; 12 Am.Jur. Sec. 328, p. 883). *Mack* held that "A condition precedent is 'a condition which must be fulfilled' (by one party) 'before the duty' (of the other party) 'to perform an existing contract arises.'" *Mack*, 10 Tenn. App. 402, 1929 WL 1657 at *13 (quoting 13 C.J. pp. 564–565).

The Tennessee courts have not been consistent in distinguishing conditional contracts from contracts subject to a condition. In a very recent, though unpublished decision, the Tennessee Court of Appeals held that a "condition precedent" may be waived even if the contract contains a clause stating that the entire agreement will be null and void if the condition is not met:

> It is true that parties to a contract are generally free to impose whatever conditions they wish on their contractual undertakings, and that if such conditions are not literally met or exactly fulfilled, no liability can arise on the promise qualified by the conditions. However, it is also "well established that a party to a contract may waive a condition precedent to his or her own performance of a contractual duty, even in the absence of a provision in the contract expressly authorizing a waiver." 13 Williston on Contracts § 39:17, at 568–69. This is so even where, as here, the contract contains a clause stating that the entire agreement will be null and void if the condition is not met.

*Tennessee Div. of United Daughters of the Confederacy v. Vanderbilt University*, 2005 WL 1033520, at *13 (Tenn.Ct.App. 2005) (some citations omitted). The court makes clear that conditions in contracts may be waived, and thus, by implication, do not prevent the contract from coming into being *until* they are performed. Indeed *McFarland* itself only indicates that contracts subject to a condition precedent do not come into being *unless* they are performed. It gives no guidance concerning *when* a contract comes into being in the event that conditions are performed or waived.

In sum, *McFarland* is both factually and legally distinct from the present case and does not control the court's decision in this case.

## III. CONCLUSION

As set forth above, the Trustee may avoid the transfer of the security interest in the Debtor's vehicle as a preferential transfer because he has carried his burden of proof on the only disputed issue, whether the transfer was on account of an antecedent debt. The transfer was a transfer on account of an antecedent debt because although the debt was incurred on February 7, 2004, the transfer of the security interest is not deemed to have occurred for purposes of the Bankruptcy Code until March 15, 2004, when application for certificate of title noting the security interest was made. Capital One has not attempted to demonstrate that it is entitled to the protection of any of the exceptions to avoidance of preferential transfers (although in the course of determining when the transfer of the security interest occurred, the court has carefully considered the applicability of the section 547(c)(3) exception).

The Trustee's motion is **GRANTED** and Capital One is directed to turnover title to the Debtor's vehicle.