**In re Lyle BENCKER and Delores Bencker, Debtors.**

**Bankruptcy No. HG 89–03577.**

United States Bankruptcy Court, W.D. Michigan.

Dec. 20, 1990.

William J. Napieralski, Grand Rapids, Mich., for debtors.

Mark D. Lansing, Alexandria, Va., for U.S.

Joseph M. Ammar, Grand Rapids, Mich., for CBS Modern Homes.

Murray B. DeGroot, Grand Rapids, Mich., for Polynesian Home Center, Inc.

Raymond B. Johnson, Laramie, Wyo., Chapter 13 Trustee.

## OPINION ON DEBTORS' PETITION TO ALLOW PAYMENT OF INSURANCE PROCEEDS

LAURENCE E. HOWARD, Bankruptcy Judge.

This matter is before the Court on the petition of the Debtors to assume a purported executory contract for the sale of a mobile home and to use a portion of certain insurance proceeds to complete the contract. The two legal issues to be decided are whether the Court has jurisdiction to act on the Debtors' petition pending an appeal of whether the proceeds are property of the estate, and whether the contract the Debtors wish to assume is an executory contract of the type contemplated by 11 U.S.C. § 365.

## FACTS AND PROCEDURAL HISTORY

The facts of this case are not in dispute. The Debtors operated a business known as Globestar Industries. The Internal Revenue Service ("IRS") filed federal tax liens against the Debtors in July of 1988 due to their failure to collect and pay over employment taxes. The cumulative amount of those liens was approximately $170,000.00, and the liens attached to all the real and personal property of the Debtors.

The Debtors owned their own home, and so the tax liens attached to it as well. On December 18, 1988, that home was destroyed by fire. The Debtors carried a policy of insurance with Auto–Owners Insurance Company ("Auto–Owners"), and filed the appropriate proofs of claim. The Debtors, through their son Peter Bencker, entered into an agreement with CBS Modern Homes ("CBS") on December 21, 1988, to purchase a new mobile home which cost $43,999.56. The Debtors intended to use the insurance proceeds from their destroyed home to finance the purchase of their new home, and CBS agreed to deliver the home to the Debtors' site without first receiving payment because Auto–Owners stood ready to pay approximately $86,-000.00 on the Debtors' insurance policy. Pursuant to the purchase agreement, CBS retained legal title to the home pending receipt of the insurance proceeds, and in fact, CBS is still in that position. After delivery of the home, but prior to payment, the IRS gave notice of the tax liens to Auto–Owners and levied against the proceeds. Accordingly, Auto–Owners, faced with competing payment demands, filed an action in interpleader in the state circuit court against the Debtors, the IRS, and CBS. On February 16, 1989, the case was removed to the United States District Court for the Western District of Michigan by the United States, and the case was assigned to Judge Richard A. Enslen. Subsequently, competing motions for summary judgment were filed by the IRS and CBS.

The Debtors filed their Chapter 13 bankruptcy petition on September 29, 1989. No notice was given to the District Court regarding the filing of the bankruptcy petition, nor was any notice given to the Bankruptcy Court of the pending interpleader action. The Debtors had not responded to the summary judgment motions pending in the District Court, so on October 24, 1989, Judge Enslen issued an order requesting the Debtors to respond. They did not, and it became apparent that the Debtors had not been served with the original interpleader complaint. On November 15, 1989, Judge Enslen entered an order requesting Auto–Owners to show cause why the Debtors had not been served. Auto–Owners did not respond, and on December 11, 1989, Judge Enslen issued an order that dismissed the Debtors from the lawsuit. Judge Enslen still had the motions for summary judgment in front of him, and still had not been informed by the remaining parties that the Debtors had filed a bankruptcy petition. On December 21, 1989, Judge Enslen decided the summary judgment motions in favor of the IRS, and ordered Auto–Owners to pay over the insurance proceeds.

In the meantime, the Debtors filed the present petition on October 13, 1989. After several adjournments, it was first heard on January 9, 1990. The Debtors' petition requests permission to use the insurance proceeds to pay CBS, but the IRS objects, arguing that the proceeds are not property of the estate because the fire occurred prepetition. I was prepared to address that legal issue when I was notified for the first time of the existence of the interpleader action and of Judge Enslen's disposition of the matter. I was lucky; no one had yet told Judge Enslen of the pending bankruptcy petition. Due to Judge Enslen's decision, I declined to act on the Debtors' petition. I adjourned the matter for two months to allow Debtors' counsel ample time to inform Judge Enslen of the Debtors' bankruptcy and to file a motion to vacate his order of December 21, 1989. Debtors' counsel filed such a motion on the day preceding my deadline, and the Debtors' petition was adjourned from time to time, pending a decision by Judge Enslen.

On July 17, 1990, Judge Enslen decided the Debtors' motion and he vacated his previous decision and reinstated the Debtors as defendants in the interpleader action. Further, Judge Enslen held that the proceeds were indeed property of the estate. As par for the course in this case, no one thought it was important to inform me of this decision.

On September 4, 1990, the Debtors' petition came up on the Court's docket from those routine adjournments. At that time, counsel informed me of Judge Enslen's decision, and were kind enough to furnish me with a copy to read during my motion day. Nonetheless, as I had been prepared on the legal issue for some eight months, I was able to render a decision at that time. I agreed with Judge Enslen, based on the case of *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), and held that the proceeds were property of the estate. The IRS appealed both Judge Enslen's and my decision.

On September 10, 1990, the Debtors filed a petition seeking to have the insurance proceeds turned over to the Chapter 13 Trustee pending the outcome of the petition to distribute them. I granted that motion on October 2, 1990. On October 11, 1990, the IRS filed a motion pursuant to Bankruptcy Rule 8005 to stay the proceedings pending its appeal. On October 30, 1990, I denied that motion. On November 16, 1990, the parties appeared on the Debtors' original petition to disburse the proceeds. The Debtors sought to pay off CBS and gain legal title to their home, and to use the balance of the proceeds to fund their Chapter 13 plan. At that time, four legal issues were presented. First, whether this Court has jurisdiction to distribute the proceeds pending the IRS' appeal; second, whether the purchase agreement between the Debtors and CBS is an executory contract capable of assumption; third, whether Peter Bencker bought the home as an agent of the Debtors; and fourth, whether there is adequate protection for

the IRS if the proceeds are distributed. As to the third issue, the parties subsequently stipulated that Peter Bencker was acting as an agent for his parents, and he submitted a sworn affidavit disavowing any interest in the home. As to the fourth issue, the IRS subsequently stipulated on the record that the other assets in the estate are adequate protection for its claims.

## DOES THIS COURT HAVE JURISDICTION TO DISTRIBUTE THE PROCEEDS?

■ The jurisdictional issue raised by the IRS has been addressed by the United States Supreme Court and by the Sixth Circuit Court of Appeals. In *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 401, 74 L.Ed.2d 225 (1982), the Supreme Court set forth the general jurisdictional effect of an appeal:

a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously. The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.

The Supreme Court has been consistent in this approach. See, e.g., *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 377, 105 S.Ct. 1327, 1330, 84 L.Ed.2d 274, *reh'g denied*, 471 U.S. 1062, 105 S.Ct. 2127, 85 L.Ed.2d 491 (1985).

Unfortunately, the Supreme Court did not expand its discussion of the jurisdictional issue in the *Griggs* decision much past the quoted material. However, the Sixth Circuit has subsequently issued four decisions that clearly define the scope of the doctrine. In *United States v. Holloway*, 740 F.2d 1373, 1382 (6th Cir.1984), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984), the Sixth Circuit took notice of the *Griggs* decision and stated that "[t]he only recognized exceptions to this rule allow a district court to enter remedial orders not affecting the merits of the appeal...." In *National Labor Rela-*

*tions Board v. Cincinnati Bronze Inc.*, 829 F.2d 585, 588 (6th Cir.1987), the Sixth Circuit drew a distinction between enforcing a judgment and expanding upon a judgment once a notice of appeal has been filed. The opinion recognized the ability of a trial court to do the former, but held that the latter was prohibited upon the filing of a notice of appeal. *Id.*

Of the four decisions, two are fairly recent. In *Jankovich v. Bowen*, 868 F.2d 867, 871 (6th Cir.1989), the Sixth Circuit went further and explained that the "rule of exclusive jurisdiction is based on judicial prudence and is not absolute.... Rather, this judicially-created doctrine is designed to avoid the confusion and inefficiency of two courts considering the same issue simultaneously...." That statement comports with the language in the *Griggs* decision, where the Supreme Court utilized the words "should not," instead of the word "cannot," in addressing the prospect of two courts asserting jurisdiction over the same matter. Finally, in *American Town Center v. Hall 83 Associates*, 912 F.2d 104, 110–11 (6th Cir.1990), the Sixth Circuit reiterated: "The standard for jurisdiction after the filing of the notice of appeal enunciated in *Cincinnati Bronze* is that a district court may enforce its judgment but not expand upon it."

The IRS has appealed the issue of whether the insurance proceeds are property of the estate. Both Judge Enslen and I have determined that the proceeds are indeed property of the estate. It seems unlikely, given the legal bases upon which those two decisions were made, that our determinations will be overturned. In addition, even if the decisions were to be reversed, the IRS will not be harmed. It has agreed that there are enough unencumbered assets in the estate to adequately protect its interest, and its lien would follow the proceeds and attach to the new home. Under the rationale in the cases I have cited, it is obvious that I have the authority to distribute the proceeds. I am not expanding upon my ruling that the proceeds are property of the estate, but rather, I am merely implementing or enforcing that ruling. Thus, I do not find that such a distribution will

jeopardize, confuse, or compromise the IRS' appeal.

## IS THE PURCHASE AGREEMENT AN EXECUTORY CONTRACT?

The Debtors assert that the purchase agreement between themselves and CBS is an executory contract, capable of assumption pursuant to 11 U.S.C. § 365. While that is the ultimate issue raised by the Debtors, both the IRS and Polynesian Home Center, Inc. ("Polynesian"), an unsecured creditor, argue that such an issue is moot because upon delivery of the unit in December of 1988, title passed. Therefore, I must first address the issue of who has legal title to the home.

Transactions involving the sale of goods generally invoke the provisions of the Uniform Commercial Code, as adopted in Michigan. As to the transfer of title to goods, state law provides:

Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading

(a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(b) if the contract requires delivery at destination, title passes on tender there.

Mich.Comp.Laws Ann. § 440.2401(2). The IRS and Polynesian argue that when CBS delivered the unit to the Debtors' site, title passed. The Debtors and CBS argue that the title provisions of the Mobile Home Commission Act, Mich.Comp.Laws Ann. § 125.2301–§ 125.2349, supersede § 440.2401(2). Alternatively, the Debtors and CBS argue that if § 440.2401(2) is not superseded, the terms of the purchase agreement provided that transfer of title would not occur until the home was paid for in full, and thus the statutory language of § 440.2401(2) that states "unless otherwise explicitly agreed" would apply and the terms of the purchase agreement would govern.

The legal proposition that a more specific body of law supersedes a general body of law is well-grounded in Michigan. In *Helms v. School District No. 6 of Davison Twp.*, 253 Mich. 248, 251–52, 234 N.W. 486 (1931), the Michigan Supreme Court held:

where there are two acts or provisions, one of which is special and particular, and certainly includes the matter in question, and the other general, which, if standing alone, would include the same matter and thus conflict with the special act or provision, the special must be taken as intended to constitute an exception to the general act or provision, especially when such general and special acts or provisions are contemporaneous, as the legislature are not presumed to have intended a conflict.

Therefore, if the title provisions of the Mobile Home Commission Act address the passage of title from a seller like CBS to a buyer like the Debtors, those provisions would govern, and I need not reach the issue of whether the agreement falls within the exception noted in the first line of § 440.2401(2).

In Michigan, mobile homes are generally considered personal property and are titled much like motor vehicles. Pursuant to Mich.Comp.Laws Ann. § 125.2330(1):

After December 31, 1978, every mobile home located in this state shall be subject to the certificate of title provisions of this act, except for any new mobile home owned by a manufacturer or licensed mobile home dealer and held for sale.

Thus, during the period of time in which a manufacturer or dealer holds a new home for sale, it need not apply for a certificate of title. When a dealer sells a new home, state law dictates that the new owner apply for a certificate of title pursuant to Mich. Comp.Laws Ann. § 125.2330a. The administrative rules promulgated by the Mobile

Home Commission define a certificate of title as "a document which is issued by the department or its authorized representative *and which establishes lawful transfer and ownership of a mobile home.*" Mich.Admin.Code r. 125.1101(1)(e) (1985) (emphasis added). Thus, the specific provisions of Mobile Home Commission Act dictate how legal ownership is transferred, and it governs over the more general provisions of the Uniform Commercial Code. Since the Debtors have yet to apply for a certificate of title, legal ownership has not yet transferred to them, and remains with CBS.

As CBS still holds legal title, I must decide whether the purchase agreement is an executory contract. The Bankruptcy Code does not provide a definition of the term "executory contract," and thus, over the years, courts have struggled with the issue of what types of agreements fall within the purview of § 365.

A recent case, *In re Terrell*, 892 F.2d 469 (6th Cir.1989), adopted the definition propounded by Professor Countryman in his article *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973). The Sixth Circuit held an executory contract to be "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Terrell* at 471, note 2. In making the determination of whether an agreement meets that definition, the Sixth Circuit held that the trial court should look to state contract law governing such agreements, and determine whether the failure to perform an existing obligation would result in a material breach of the contract. *Terrell* at 471–72. In other words, in the context of the Debtors, if a mobile home dealer delivered a unit to a buyer, and reserved legal title pending payment of the purchase price, would an executory contract exist?

I believe the answer to that query is yes. The remaining obligations of the Debtors and CBS are strikingly similar to those which faced the Sixth Circuit in the *Terrell* case; namely, payment of the full purchase price by the buyers and the passage of legal title by the seller. The *Terrell* decision made no distinction between real and personal property, but rather, directed that a trial court's focus should be "on the nature of the unperformed obligations of the two parties [and] the legal effect of the failure to perform." *Terrell* at 472. As to the Debtors, the purchase agreement requires them to pay the purchase price. It is a material obligation as the failure to do so would result in a breach of the contract. CBS has delivered the home, and the Debtors have no greater obligation under the contract than to pay for it. If the Debtors breach the contract by not paying for the home, CBS could avail itself of the remedies provided by Article 2 of the Uniform Commercial Code for an aggrieved seller, and as contemplated by the purchase agreement. Those Uniform Commercial Code sections would apply in this instance because the Mobile Home Commission Act does not provide remedies for breaches of contract.

As to CBS, the purchase agreement requires it to relinquish ownership of the home once the money is received. While the Debtors must make application for the certificate of title, by virtue of the language of § 125.2330a, they cannot do so without the aid of CBS. Such assistance is contemplated by the administrative rules:

> (1) The certificate of origin shall be attached as an addendum to the application for a certificate of mobile home title when filing for an original certificate of mobile home title.

> (2) For the purposes of complying with subrule (1) of this rule, the certificate of origin shall be immediately surrendered by the lender holding such certificate to the dealer upon request.

Mich.Admin.Code r. 125.1232 (1985). When a mobile home is manufactured and shipped to a dealer, it is accompanied by a certificate of origin, which serves as temporary evidence of legal ownership. A copy of the certificate of origin for the Debtors' home was attached as exhibit 2 to CBS' brief on this matter. The certificate of

origin clearly indicates that legal ownership was transferred from the manufacturer to CBS. The administrative rule envisions that mobile home dealers, like car dealers, floorplan their units, so the certificate of origin is held by the financier until the unit is sold to a consumer. Also, the rule contemplates that the dealer must obtain the certificate of origin from the lender, and attach it to the application for certificate of title as required. This indicates that the dealer is a necessary party to the title application. The dealer also has other obligations in submitting the application for certificate of title:

(1) A person shall, on a form prescribed by the commission, file an application for a certificate of mobile home title and the appropriate fee with the department or its authorized representative within 20 days after the closing of the sale transaction. In addition, a late fee of $15.00 shall be charged if the application is filed after the 20–day limit.

(2) An additional fee of $5.00 shall be added to all other fees if a title is requested to be issued expeditiously.

(3) All mobile home dealers and brokers shall pay the appropriate amount of sales tax at the time of filing the application.

Mich.Reg. r. 125.1302 (Jan.1990). Since a dealer, such as CBS, is required to pay the sales tax at the time of the filing of the application for certificate of title, it would appear that as with motor vehicles, the buyer may fill out the necessary forms, but it is the dealer who obtains the title for the buyer. This, coupled with the necessity of obtaining or providing the certificate of origin, leads to the conclusion that a substantial obligation rests with CBS as well. If the Debtors remit full payment to CBS, and CBS refuses to relinquish ownership or to provide the necessary assistance to submit the application for a certificate of title, it will have breached its contractual obligation to pass title upon receipt of the money. As such, the Debtors could utilize the provisions of Article 2 of the Uniform Commercial Code for aggrieved buyers.

Thus, the remaining obligations of the parties to the purchase agreement, payment of the purchase price and the passage of title, are the most important ones each party possesses. Indeed, those two obligations are the fundamental elements of any sale of goods. The Debtors, as buyers, agreed to pay a certain price for the mobile home, and CBS, as seller, agreed to relinquish ownership. Therefore, under the rationale set forth in *Terrell*, the purchase agreement between the Debtors and CBS is an executory contract within the purview of 11 U.S.C. § 365.

### CONCLUSION

The IRS' appeal of the decision that the insurance proceeds are property of the estate has not divested this Court of jurisdiction to distribute those proceeds. Such a distribution is the implementation of a previous order, and not the expansion of that order.

Additionally, the purchase agreement is an executory contract pursuant to 11 U.S.C. § 365, and may be assumed by the Debtors. Legal title still remains with CBS, and upon payment of the full purchase price, CBS is obligated to relinquish ownership and effectuate the transfer of legal title to the Debtors.

After payment in full is made to CBS, the Chapter 13 Trustee will be holding a balance of approximately $42,000.00 from the insurance proceeds. The Debtors propose to use that balance to fund their Chapter 13 plan. Any decision on the application of those funds will be made when the Debtors' Chapter 13 plan is brought on for a confirmation hearing.