**In re J. ADRIAN SONS, INC., Debtor.**

**Bankruptcy No. 95–11682 K.**

United States Bankruptcy Court, W.D. New York.

Feb. 5, 1997.

Cheryl R. Storie, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, for movant.

Gerald L. Kohn, James E. Rolls, Rolls, Tracy, Scott, Gioia & Kohn, Buffalo, NY, for debtor.

MICHAEL J. KAPLAN, Chief Judge.

In this Chapter 11 case, Empire National Leasing, Inc. ("Empire") seeks relief from the automatic stay, 11 U.S.C. § 362(d), in order to regain possession of meat processing or packaging equipment which is in the Debtor's possession. The equipment in question was the subject of a lease between the Debtor (a sausage maker) and Empire which expired by its own terms prior to bankruptcy. (The lease was for 60 months, at $549.75 per month. It expired on November 17, 1994 and the Debtor filed on May 22, 1995.) This lease contained a purchase option whereby upon completion of the base term of the lease, the Debtor could purchase the equipment by giving Empire written notice of the Debtor's desire to exercise the option and paying Empire the fair market value of the equipment (as determined by Empire) in "immediately available funds." The option also provided that,

> Title to the Equipment shall pass to [the Debtor] as of the last day of the Base Term set forth in the Lease Agreement ... if we receive such notice and purchase price before the expiration of the Base Term or as of the last day of the month in which we receive such notice and purchase price if we receive such notice and purchase price after the expiration of the Base Term.

There was never any formal security agreement executed, and no U.C.C. 1 was ever filed regarding the equipment.

In a letter dated October 1, 1994, Empire advised the Debtor that its lease soon would be ending and reminded the Debtor of its option to purchase the equipment. Empire requested that the Debtor either send payment of the $3,186.75 purchase price or return the equipment by November 17, 1994.

Because the Debtor could not pay the purchase price in one lump sum, negotiations ensued. Empire consequently agreed to accept a higher purchase price ($3,888) in twelve (12) monthly installments of $324. This agreement is memorialized in Empire's December 30, 1994 letter to the Debtor. Although the lease number is referenced in the heading of the letter, no mention is made regarding when title to the equipment was to pass to the Debtor. As of April 25, 1995, the Debtor had paid only $800 out of a total of $1296 then owed in monthly payments. The Debtor has not made any further payments since the May 22, 1995 filing, almost two years ago. This Motion was filed on December 17, 1996. (Apparently, Empire has been patiently awaiting a reorganization.)

Based on the above-quoted language of the purchase option Empire claims ownership of the equipment because the terms of the purchase option specifically contemplated that title not pass to the Debtor unless and until payment was received in full. To support its position, Empire cites a portion of the Uniform Commercial Code's § 2–401(1) which states that "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." N.Y.U.C.C. § 2–401(1) (McKinney 1993).

It is the Debtor's position that it did not exercise its *option* to purchase, but rather entered into a purchase agreement separate

and distinct from the purchase option contained in the lease. Therefore, the Debtor argues, the term of the purchase option which contemplated that title not pass until payment was made in full did not apply to this transaction. The Debtor argues that under § 2–401(3)[1] title to the equipment passed to the Debtor at the time the parties entered into their new agreement. Section 2–401(3), in pertinent part, says that "*Unless otherwise explicitly agreed,* where delivery is to be made without moving the goods, ... (b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting." N.Y.U.C.C. § 2–401(3)(b) (McKinney 1993).

For the reasons to follow, whether or not this contract for sale was, as Empire argues, a modification of the purchase option extending the time for payment, or, a separate and distinct agreement, as the Debtor argues, the *most* that Empire has in this situation is an unperfected security interest in the equipment. In either situation the transaction is a contract for sale subject to the provisions of the Uniform Commercial Code. Specifically § 2–401(1).

Quoted in its entirety, § 2–401(1) reads:

Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2–501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act. *Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9),* title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

N.Y.U.C.C. § 2–401(1) (McKinney 1993).

Even if we assume, for the sake of argument, that Empire is correct in believing that the title-retention provisions of the original agreement remained in full force and effect after the "modification," we are left with the question of whether the emphasized language limits the § 2–401(3) contemplation of agreements to the contrary.[2]

Although the question is not free from doubt in light of the structure of § 2–401 and the paucity of case authority on this point, what authority there is is to the effect that § 2–401(1) "trumps" § 2–401(3). The principal authority is *Connecticut Bank & Trust v. Schindelman (In re Bosson),* 432 F.Supp. 1013 (D.Conn.1977). The key language of § 2–401(3) is "Unless otherwise explicitly agreed...." The same language appears in § 2–401(2), and the *Bosson* case dealt with § 2–401(2). In that context it was stated that § 2–401(1) "places limits on the parties' contractual freedom. Specifically, § 2–401(1) negates any attempt to forestall passage of title beyond the moment of final delivery; contract language purporting to do so merely results in a security interest being retained." *Bosson,* 432 F.Supp. at 1021 n. 24; *see also In re Gull Air, Inc.,* 73 B.R. 820 (Bankr. D.Mass.1987).

Similarly, it was suggested in the case of *New England Yacht Sales, Inc. v. Commissioner,* 198 Conn. 624, 504 A.2d 506 (1986), that what is contained in § 2–401(1) are the "baseline" principles, while subsections (2) and (3) provide "objective tests" in the absence of a § 2–401(1) agreement. *Id.* at 509.

This Court agrees with these authorities. Let us carefully examine the structure of § 2–401. Because § 2–401(1) deals with express agreements regarding passage of title as a general rule, § 2–401(2) and § 2–401(3) can only be viewed as dealing with certain common fact patterns in which the parties did not make express agreement regarding passage of title, and where, for example, the goods are being shipped, the goods are in

---

1. The Debtor's reference to § 2–401(2) seems to be in error because its argument is squarely within § 2–401(3).

2. Although Empire does not argue that this matter is not governed by § 2–401, a reader of this decision should note that there cannot be any suggestion that this was a mere lease extension. Rental payments had ceased. The term had expired. The only matter addressed by the new agreement was paying off the purchase price, with interest.

storage or are at their usual place of repose, or where (as here) the goods are already in possession of the buyer. The "Unless" clauses which introduce them demonstrate the drafters' intent that § 2–401(2) and (3) are "default" rules—rules that apply in the absence of contrary agreement. But any contrary agreement cannot conflict with § 2–401(1). The "Unless ..." clauses are to be read as if they said: "In the absence of *such* an agreement which explicitly provides to the contrary ...," in which event the "such" would refer to agreements contemplated by § 2–401(1), including its limitations. This writer has tinkered with the language and is convinced that there is no logical construction of § 2–401(2) or § 2–401(3) that would permit disobedience to § 2–401(1). Section 2–401(1) deals with agreements. Sections 2–401(2) and (3) deal with certain fact patterns in the absence of such an agreement. The seller's only option is to perfect its security interest, which Empire did not do.

Thus, even if, as Empire argues, the new agreement was only a modification of the purchase option contained in the lease and Empire sought to retain title until the completion of payments, such attempt to retain title only amounts to an unperfected security interest in the goods sold. If, on the other hand, the new agreement stands alone as separate and distinct from the purchase option, as the Debtor argues, Empire is left without even a vestige of a claim of a security interest in the equipment (there having been no security agreement executed, and no retention of title), and also loses.

Empire's motion must be denied; Empire's claim is merely an unsecured debt.

SO ORDERED.