In re **PRO PAGE PARTNERS, LLC, Debtor.**

Pro Page Partners, LLC, Plaintiff,

v.

**Message Express Paging Company, Inc., Defendant.**

Bankruptcy No. 00–22856.
Adversary No. 01–2013.

United States Bankruptcy Court, E.D. Tennessee.

Aug. 31, 2001.

Mark S. Dessauer, Esq., Hunter, Smith & Davis, LLP, Kingsport, TN, for Pro Page Partners, LLC.

Mark M. Lawson, Esq., Eric W. Reecher, Esq., Elliott Lawson & Pomrenke, P.C., Bristol, VA, for Message Express Paging Company, Inc.

### MEMORANDUM

MARCIA PHILLIPS PARSONS, Bankruptcy Judge.

In this adversary proceeding, the debtor seeks a determination that an agreement between it and the defendant, Message Express Paging Company, Inc. ("Message Express"), is a financing arrangement for the purchase of personalty rather than an executory contract such that certain payments by the debtor to Message Express are avoidable pursuant to 11 U.S.C. §§ 547 and 549. Presently pending before the court are the parties' cross motions for summary judgment on the issue of wheth-

er the agreement in question is an executory contract. Because the court concludes that the parties' agreement is not an executory contract, the court will grant the debtor's motion for partial summary judgment and deny the summary judgment motion of Message Express. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A),(F) and (K).

## I.

The debtor, Pro Page Partners, LLC, filed for chapter 11 relief on October 23, 2000. Shortly thereafter, Message Express moved the court for an order compelling the debtor to assume or reject in accordance with 11 U.S.C. § 365(d)(2) a certain alleged executory contract between the parties dated January 17, 1997 (the "Agreement"). By agreed order entered December 21, 2000 ("the Agreed Order"), the debtor assumed the Agreement with Message Express, agreeing to make current monthly payments of $4,000 to Message Express as required under the Agreement and to cure a $34,500 arrearage by making additional monthly payments of $2,040.34 beginning March 15, 2001. The Agreed Order further provided that "Message Express and Debtor are granted leave to file a motion to amend this order should they determine that such amendment is required to protect their respective interest."

Subsequently, on March 14, 2001, the debtor moved to amend or for relief from the Agreed Order. The debtor asserted in the motion that it had erroneously concluded that the Agreement was an executory contract and that instead, the Agreement was "nothing more than a financing arrangement for the purchase of assets." The debtor noted that contemporaneous with the filing of the motion, it had commenced this adversary proceeding seeking a determination of the Agreement's nonexecutory status. The debtor requested in the motion that the court vacate the Agreed Order or, in the alternative, suspend its enforceability pending the outcome of the adversary proceeding. After a hearing, the court granted the debtor's motion and suspended the Agreed Order, although directing the debtor to escrow the monthly payments required under the Agreed Order pending a final adjudication of the present adversary proceeding.

As set forth in the Agreement, a copy of which was attached to the complaint commencing this adversary proceeding, the parties contracted in the Agreement for the debtor to "manage and operate in totality the business of Message Express." As consideration for these management services, the debtor was to receive the profit generated by Message Express' business after payment of the business' expenses and $4,000 a month to Message Express. The parties acknowledged in their Agreement that Message Express had received $50,000 from the debtor "for an option to purchase Message Express" during a nine-year period for a purchase price of $310,000. The Agreement provided that in the event the debtor exercised the purchase option, the $4,000 monthly payments made in connection with the management aspect of the Agreement would be applied to the $310,000 purchase price. As specified in the Agreement, the assets which comprised Message Express included the "accounts receivable of Message Express," the "paging units comprising the customer base of Message Express," the "rights of Message Express under the Resellers Agreement between Message Express and Preferred Networks, Inc.," a "Z21 paging terminal," "[t]wo 486 computers," the leasehold rights of Message Express to a paging terminal site on Buffalo Mountain and certain space in Johnson City, Tennessee, and the office equipment located at those sites.

Other provisions in the Agreement required the debtor to "increase gross collected revenues of Message Express" by $1,000 per month and to "market paging units independently of Message Express." The Agreement permitted Message Express to inspect the debtor's books and records relating to the Agreement at any time, and specified that the debtor's obligations under the Agreement were to be secured by the personal guaranties of two named individuals.

The debtor alleges in the complaint that when the Agreement was made, Message Express turned over to the debtor the assets specified in the Agreement and thereafter the debtor "fully integrated such assets with its other operations. . . ." The debtor further alleges that although "the Agreement appears to require that Pro Page segregate and separately account for the Message Express customer base from that of Pro Pages's other customers, such segregation or separate accounting was never done but the business of Pro Page was operated as a single entity." The debtor alleges that at all times "Message Express was aware and consented to such business practices, notwithstanding the terms of the Agreement."

Based on those allegations, the debtor contends that the Agreement constitutes an financing arrangement rather than an executory contract because: (1) Message Express has no substantial obligations remaining under the agreement; (2) the debtor's only outstanding duty under the Agreement is the payment of money; (3) the option provisions of the Agreement are nothing more than a means for payment of the purchase price; and (4) the Agreement contains all the earmarkings of a financing arrangement, including payment of monthly installments of principal and interest which are applied to the purchase price, the failure of the debtor to make its monthly payments constitutes a default, and the obligations of the debtor are personally guaranteed by two of its then owners and officers. The debtor maintains that because the Agreement is a financing arrangement rather than an executory contract, the assets covered by the Agreement are property of the debtor's bankruptcy estate and "Message Express has no right to any type of performance under 11 U.S.C. § 365 that might be due and owing with respect to an unassumed executory contract." The debtor also asserts that even though the Agreement is a financing arrangement, Message Express is only an unsecured, unperfected creditor because there is no language in the Agreement granting a security interest and Message Express did not file a U.C.C.–1 financing statement. Due to this unperfected and unsecured status, the debtor seeks to avoid pursuant to 11 U.S.C. §§ 547 and 549 certain pre and postpetition payments which it made to Message Express.

In its answer to the complaint, Message Express denies that the Agreement is anything other than an executory contract. Message Express admits that possession of the assets described in the Agreement was turned over to the debtor by Message Express, but denies that there was any transfer of ownership or title.

On July 2, 2001, the debtor filed the motion for partial summary judgment which is presently before this court. In the motion, the debtor asserts that there is no genuine issue of material fact and that as a matter of law, "the Agreement is a financing arrangement in the form an installment sales contract and not an executory contract." In support of its motion, the debtor has submitted the affidavit of the debtor's chief manager, Joe Potter, the responses of Message Express to the debtor's first set of interrogatories and request

for production of documents, and Message Express' responses to the debtor's second request for production of documents, which includes copies of the federal income tax returns for 1997, 1998, 1999 and 2000 filed by Message Express.

Mr. Potter states in his affidavit that at the time of the initial $50,000 payment, "the assets of Message Express described in the Agreement were transferred or delivered to Pro Page and fully integrated into its computer system," that those "assets consisted primarily of approximately 700 paging account customers or paging contracts previously serviced by Message Express," that the "customers were thereafter billed and serviced by Pro Page as Pro Page customers," and "monies earned on these accounts were treated as Pro Page's income." Mr. Potter also states that the other "assets described in the Agreement never existed, have been abandoned, or no longer exist." In this regard, Mr. Potter explains that "there was no agreement in place between Message Express and Preferred Networks, Inc. at the time of the Agreement," the accounts receivable of Message Express existing on the date of the Agreement "have either been collected by Pro Page and the proceeds used in its operations or abandoned," the leasehold interests in the terminal site on Buffalo Mountain and for space in Johnson City, Tennessee were abandoned, and "the Z21 paging terminal was destroyed by lightening on December 31, 1998."

Mr. Potter notes in his affidavit that "the Agreement has been treated by Pro Page for federal income tax purposes as a capital acquisition and the property acquired depreciated on Pro Page's tax return." Mr. Potter also states that "Message Express has not requested any financial or other information regarding Pro Page at any time during the pendency of the Agreement" and that "Message Express never insisted that Pro Page increase its revenues by $1,000.00 per month."

The same day that the debtor filed its motion for partial summary judgment, Message Express filed its own summary judgment motion, wherein it asks the court to declare the Agreement an executory contract within the meaning of 11 U.S.C. § 365 and dismiss the debtor's complaint. Message Express asserts that the Agreement is an executory contract because performance under the contract remains due to some extent on both sides: payment and exercise of the purchase option by the debtor and a corresponding transfer of legal title to the assets by Message Express once the option is exercised and payment completed.

## II.

■ The court will first address Message Express' assertion that there is no basis under Fed.R.Civ.P. 60 for setting aside the Agreed Order and that the debtor admitted the Agreement is executory by assuming it pursuant to the Agreed Order. Message Express contends that because of this admission it would be prejudiced by a different determination at this late date in that had the debtor asserted at the beginning of the underlying chapter 11 case that the Agreement was not executory, Message Express would have litigated and resolved the issue at that time without incurring further fees and expenses.

The court finds these arguments to be without merit. With respect to the Fed.R.Civ.P. 60 argument, the court notes that the Agreed Order specifically reserved the prospective right of the parties to request that the Agreed Order be amended. As such, the Agreed Order was not final. Because Rule 60 only applies to final orders, it presents no barrier to the debtor's re-

quest that the court determine the Agreement's status.

■ With respect to Message Express' prejudice argument, the court notes that this adversary proceeding was filed less than six months after the chapter 11 case was filed and less than four months after entry of the Agreed Order. Regardless of whether the debtor raised the issue at the beginning of the case or six months later, Message Express would still have to incur the expense of defending this adversary proceeding and the executory contract determination. In light of this slight delay [1] and the fact that the expenses would have been borne by Message Express anyway, the court finds no basis for concluding that the debtor should be barred at this time from challenging the status of the Agreement.

A somewhat similar argument was presented to a bankruptcy court in the case of *In re Fitch,* 174 B.R. 96 (Bankr.S.D.Ill. 1994), wherein the debtors initially assumed an installment contract for the purchase of a business, but subsequently proposed to treat the contract seller as a secured creditor in their chapter 12 plan. The seller objected to the plan on the basis that the debtors were estopped from changing their characterization of the contract. *Id.* at 100. The court rejected this

argument, concluding that the seller had not shown any prejudice. *Id.*

The court also noted that debtors cannot change the nature of a contract from nonexecutory to executory merely by electing to assume it. "[A] debtor's assumption of what is, in actuality, a security agreement would result in that creditor receiving a preference over other secured creditors whose claims are subject to modification." *Id.* at 101. A similar result of course would be reached in the present case if this court determined that the Agreement was nonexecutory, but that the Agreed Order could not be set aside. In light of the possibility of this inequitable result to the other creditors, the lack of prejudice to Message Express, and the nonfinality of the Agreed Order, the court concludes that it is appropriate to address the merits of this adversary proceeding.[2]

### III.

■ The court now turns to the issue of whether the Agreement is in fact an executory contract. In *In re Terrell,* the Sixth Circuit Court of Appeals observed that "[t]he Bankruptcy Code does not explicitly define the term 'executory contract.' The legislative history, however, indicates that Congress intended the term to be defined as a contract 'on which per-

---

**1.** 11 U.S.C. § 365(d)(2) generally allows a chapter 11 debtor up until confirmation of a plan in which to assume or reject an executory contract. An exception may be made when a party to the contract specifically requests and the court in its discretion determines that an earlier deadline should be imposed. *See, e.g., In re Physician Health Corp.,* 262 B.R. 290, 292 (Bankr.D.Del.2001). Even when a party requests an earlier deadline, however, it has been noted that "the debtor should at least be allowed the 120 day period during which a debtor is granted the exclusive right to formulate a plan for reorganization, unless a compelling reason is established for shortening the time." *See In re Taber Farm Associates,* 115 B.R. 455, 457 (Bankr.S.D.N.Y.

1990). As previously stated, Message Express filed a motion to compel the debtor to assume or reject the Agreement although it was not necessary for the court to rule on the motion due to the parties' submission of the Agreed Order. The court observes, however, that Message Express' motion was filed only 20 days after the debtor's bankruptcy case was commenced.

**2.** The court notes that, in effect, this ruling was previously made when the court granted the debtor's March 14, 2001 motion requesting that the Agreed Order be amended or for relief by suspending the Agreed Order.

formance remains due to some extent on both sides.' " *Terrell v. Albaugh (In re Terrell)*, 892 F.2d 469, 471 (6th Cir.1989) (quoting S. REP. NO. 95–989, at 58 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5844). In a footnote in the *Terrell* decision, the court stated:

> Congress apparently had in mind the definition of executory contracts set forth in Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn. L.Rev. 439, 460 (1973). Professor Countryman defined an executory contract for the purposes of the Bankruptcy Code as "a contract under which the obligation of both the bankrupt and the other party are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Id.* at 470.

*In re Terrell*, 892 F.2d at 471 n. 2. The Sixth Circuit further noted that while federal law defines the term executory contract, "the question of the legal consequences of one party's failure to perform its remaining obligations under a contract is an issue of state contract law." *Id.* at 471.

The issue before the court in *Terrell* was whether a land sale contract was an executory contract within the meaning of 11 U.S.C. § 365. The debtors in *Terrell* argued that the contract was merely a security interest analogous to a mortgage such that the obligation was subject to the cramdown provisions of the Bankruptcy Code. The creditor on the other hand maintained that the contract was executory which if assumed must be performed according to its terms. *Id.* Utilizing the definition of an executory contract quoted above, the court concluded that the contract was executory. Material obligations were left to be performed by both parties to the contract: the debtors were obligat-

ed to make installment payments for several more years and the creditor had not surrendered legal title to the property even though he had given occupancy. *Id.* at 472. Furthermore, under Michigan law, the failure of either party to perform his remaining obligations would give rise to a material breach allowing the other party to avoid continued performance. *Id.*

In its motion for summary judgment, Message Express asserts that the facts of the instant case are analogous to those in *Terrell* in that obligations remain to be performed by both parties: the debtor must complete the monthly payments and upon that completion, Message Express must surrender legal title to the assets. In response, the debtor notes that there is a critical distinction between *Terrell* and the present case in that *Terrell* involved a contract for the sale of real property while the Agreement herein concerns the sale of personalty. According to the debtor, under Tennessee law, legal title to personal property or goods is transferred upon delivery such that any retention or reservation of title after delivery to the buyer amounts to a mere retention of a security interest, citing TENN. CODE ANN. § 47–2–401(2) and *Jahn v. Quintrell (In re Tom Woods Used Cars, Inc.)*, 21 B.R. 560 (Bankr.E.D.Tenn.1982). As such, the debtor argues that Message Express surrendered title to the assets covered by the Agreement when they were delivered and, therefore, Message Express has no remaining obligations under the Agreement.

From a review of the Agreement, the only remaining obligation on the part of Message Express is that set forth in *paragraph 8* which provides: "Message Express, upon exercise of the option, agrees to convey the foregoing property, together with any accessions, additions, improvements or replacement property or after-acquired property." The issue arises as to

whether this obligation is illusory in light of the previous transfer of possession or whether the obligation is material such that under Tennessee law, Message Express' failure to perform would constitute a breach entitling the debtor to damages, specific performance or rescission of the Agreement. The answer to this question would appear to turn on whether title passed upon delivery as the debtor contends or whether further action to "convey" the property is required as Message Express maintains.

A portion of the assets covered by the Agreement, i.e., the computers, paging terminal, office equipment and paging units, are "goods" as defined under the Uniform Commercial Code. *See* TENN. CODE ANN. § 47–2–105(1).[3] With respect to when title to the sale of goods passes, the Uniform Commercial Code, as adopted in Tennessee, provides in part the following rules:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (§ 47–2–501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by chapters 1–9 of this title. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the chapter on Secured Transactions (chapter 9 of this title), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and

place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading:

(a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(b) if the contract requires delivery at destination, title passes on tender there. TENN. CODE ANN. § 47–2–401 [U.C.C. § 2–401].

From a review of these provisions as applied to the facts of the present case, it would appear that "[u]nless [the parties] otherwise explicitly agreed," title to the goods covered by the Agreement passed when they were delivered by Message Express to the debtor and, at most, all that Message Express retained pending receipt of payment was a security interest. The Agreement does not specifically address when title to the assets being sold would pass; instead, the contract simply states, as noted above, that upon exercise of the option, Message Express will "convey" the property.

From a review of the Tennessee law on point, it does not appear that this language constitutes an "explicit agreement" as to the passage of title. In *AHCI, Inc. v. Short*, the Tennessee Court of Appeals was presented with the issue of whether the purchaser and possessor of certain

---

**3.** TENN. CODE ANN. § 47–2–105(1) provides in part that:

"Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the

contract for sale other than the money in which the price is to be paid, investment securities (chapter 8 of this title) and things in action.

restaurant equipment had title to the property even though it had not completed all of the payments required under purchase agreement. *AHCI, Inc. v. Short,* 878 S.W.2d 112 (Tenn.App.1993). The agreement in that case did not specifically address passage of title, but did state that upon fulfillment of the purchaser's purchase obligations under the agreement, "it is understood by both parties that the equipment, rights and use thereof, shall belong then and forever to [purchaser]." *Id.* at 114. Notwithstanding this language, the Tennessee Court of Appeals concluded that this provision did not meet the criteria for a "title retained contract." In reaching this conclusion, the court relied on the directive expressed by the Tennessee Supreme Court that:

> Unless the language of the contract clearly makes out a conditional sale, this Court will not extend the law of Conditional Sales by implication. . . .
>
> If there is doubt whether or not the contract presented is or is not a contract of conditional sale, the doubt will be resolved against holding such contract a conditional sale.

*Id.* at 114–15 (quoting *Matthews v. Archie,* 196 Tenn. 417, 268 S.W.2d 334, 336 (1954)).

While this holding is instructive to the case at hand, the second portion of the *Short* opinion is particularly relevant as the court went on to note that:

> Even assuming, arguendo, that [the contract provided for title to be retained pending payment, the purchaser's] interest is limited to an unperfected security interest under the U.C.C. . . . Section 401(1) of Article 2, codified at TENN. CODE ANN. § 47–2–401(1) limits the interest of a seller who retains title to the goods but delivers them to the purchaser to that of a security interest. The statute, as pertinent here, provides: "Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. . . ."

*Id.* at 115.

■ As additional authority for its ruling, the *Short* court referenced[4] the *Tom Woods Used Cars* decision cited by the debtor herein. In that case, the seller of an automobile asserted that he remained the owner despite delivery to the purchaser because the purchaser had not made payment and the seller had not surrendered control of the title certificate. *In re Tom Woods Used Cars,* 21 B.R. at 565. Based on the language of TENN. CODE ANN. § 47–2–401(1) quoted above, Bankruptcy Judge Ralph Kelley rejected this argument, stating "[i]t is important to under-

---

4. The Tennessee Court of Appeals in *Short* also cited the bankruptcy court decision of *Weaver v. Ford Motor Credit Co. (In re McFarland),* 112 B.R. 906 (Bankr.E.D.Tenn.1990), as support for its ruling. Although the *Short* decision was rendered in November 1993, the court failed to note that the *McFarland* decision had been reversed by the district court in 1990 and that this reversal was upheld by the Sixth Circuit Court of Appeals in 1991. *See In re McFarland,* 131 B.R. 627 (E.D.Tenn. 1990), *aff'd,* 943 F.2d 52, 1991 WL 175279 (6th Cir. Sept.10, 1991). *McFarland* involved an automobile retail sales contract which was subject to acceptance by a lending institution and concerned the question of whether the purchaser had rights in the automobile upon possession or when the lending institution subsequently accepted the contract. The appellate courts concluded that the purchaser had mere possessory rights in the automobile until the contract was accepted, which acceptance was a condition precedent to the contract coming into being. 131 B.R. at 633. *McFarland* is distinguishable from the facts of the present case which concerns passage of title under an existing contract since *McFarland* involved the issue of title under a contract which had not yet come into existence due to a condition precedent.

stand that the parties to a sale can agree on when title passes only to a degree. Any retention or reservation of title in the seller after delivery to the buyer amounts to retention of a security interest." *Id.* *See also In re Phillips*, 77 B.R. 648, 649–50 (Bankr.E.D.Tenn.1987) (debtor with possession of equipment was deemed owner despite letter agreement which contemplated that title would not pass until other documents were completed and signed); TENN. CODE ANN. § 47–1–201(37)(A)("The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (§ 47–2–401) is limited in effect to a reservation of a 'security interest.' ").

The correctness of these holdings is supported by cases from other jurisdictions construing the same U.C.C. provision as TENN. CODE ANN. § 47–2–401. For example, in a decision under Ohio law, the Sixth Circuit Court of Appeals noted that under a conditional sales contract providing that the equipment would remain the property of the seller until the purchase price was paid, the seller's "retention of title had the effect of the reservation of a security interest" under the Uniform Commercial Code. *Matter of DeVita Fruit Co. v. FCA Leasing Corp.*, 473 F.2d 585, 588 (6th Cir.1973) (citing OHIO REV. CODE ANN. § 1302.42(A) (U.C.C. § 2–401(1))). Another court, applying the same Ohio statutory provision, has similarly concluded:

> While the Uniform Commercial Code does permit the parties some power by allowing the parties to agree as to when title will transfer, the Code and the caselaw place a limitation on this power. In short, if the seller attempts to retain title after delivery or until paid in full, all the seller gets is a security interest.

*Associated Indus. v. Keystone Gen., Inc. (Matter of Keystone Gen., Inc.)*, 135 B.R. 275, 279 (Bankr.S.D.Ohio 1991). *See also In re J. Adrian Sons, Inc.*, 205 B.R. 24, 26 (Bankr.W.D.N.Y.1997) ("Section 2–401(1) places limits on the parties' contractual freedom. Specifically, § 2–401(1) negates any attempt to forestall passage of title beyond the moment of final delivery; contract language purporting to do so merely results in a security interest being retained."). Based on these authorities, this court concludes in the present case that title to the computers, paging terminal, office equipment and paging units passed when these assets were delivered to the debtor.

Other assets covered by the Agreement, Message Express' interest in a certain resellers agreement, accounts receivable and the customer accounts of Message Express, are not "goods" within the meaning of the Uniform Commercial Code, but instead constitute accounts and contract rights. While such sales are generally governed by Article 9 of the U.C.C.,[5] specifically excepted from the scope of the chapter is "a sale of accounts ... as part of a sale of the business out of which they arose"; "an assignment of accounts ... which is for the purpose of collection only"; and "an assignment of a right to payment under a contract to an assignee that is also obligated to perform under the contract." *See* TENN. CODE ANN. § 47–9–109(d)(4),(5) and (6) (formerly TENN. CODE ANN. § 47–9–104(f)). Thus, there appears to be no statutory law addressing the passage of title of accounts or contracts rights as in the present case.

Despite this absence, it would appear that the debtor is correct with respect to the distinction between sales of personalty and realty. The statute of frauds, as enacted in Tennessee and many other states, requires transfers of real property to be in

**5.** *See* TENN. CODE ANN. § 47–9–109(3) (formerly

TENN. CODE ANN. § 47–9–102(1)(b)).

writing in order to be effective. *See* TENN. CODE ANN. § 29–2–101(4). No similar statutory requirement applies to conveyances of personal property. Since possession of these assets has previously been delivered to the debtor, it is difficult to understand how any future refusal or failure on the part of Message Express to "convey" the assets to the debtor, as the Agreement appears to require, would be a material breach, entitling the debtor to all of the contract remedies generally available upon the occurrence of a breach, i.e., specific performance, damages or rescission. Specific performance would be appear to be duplicative since the debtor already has possession and all of the attributes of ownership even in the absence of a bill of sale executed by Message Express. No damages would be generated by any refusal to "convey"; nor would rescission and return of the payments be ordered since the debtor in effect already has the benefit of its bargain.[6]

The majority of courts which have considered this issue have concluded, based on the Uniform Commercial Code as adopted by the various states, that an agreement for the sale of personalty is not an executory contract if the seller has surrendered possession, even though the agreement specifically provides for retention of title pending completion of payments. In the most recent decision which this court was able to locate, the debtors, one year prior to their bankruptcy filing, entered into an agreement for the purchase of a meat-processing business and its underlying assets. *See In re Fitch,* 174 B.R. at 99. The agreement provided for payment over seven years at which time title to the business property would be delivered to the debt-

ors. In their chapter 12 plan, the debtors proposed to treat the seller as a secured creditor and pay him the reduced value of the collateral rather than the amount remaining due under the contract. The court overruled the seller's objection to the plan, concluding that the contract was not executory since physical possession of the personal property had been delivered at the time the contract was signed and the seller's only remaining obligation was delivery of a bill of sale upon completion of payments. *Id.* at 102.

As authority for this conclusion, the *Fitch* court cited U.C.C. §§ 2–401(1) and 1–201(37) as enacted in Illinois (which are identical to TENN. CODE ANN. §§ 47–2–401(2) and 47–1–201(37)(A)) for the proposition that "retention or reservation of title by a seller of goods notwithstanding delivery to the buyer is limited in effect to a reservation of a security interest." *Id.* (citing 810 ILL. COMP. STAT. ANN. § 5/1–201(37)). Other courts have reached similar outcomes. *See In re Hartman,* 102 B.R. 90, 94 (Bankr.N.D.Tex.1989) (contract for the sale of goods nonexecutory citing U.C.C. § 2.401(a)); *In re McDaniel,* 89 B.R. 861, 875 n. 10 (Bankr.E.D.Wash.1988) (duty to provide bill of sale for personal property did not render the contract executory, citing U.C.C. § 2–401(1) that any reservation or retention of title is limited to a security interest); *In re Hart,* 61 B.R. 135, 136 (Bankr.D.Or.1986) (seller's reservation of title under contract for sale of business property constituted security interest under U.C.C. § 2–401(1)). *See also In re Lewis,* 185 B.R. 66, 68 (Bankr. N.D.Cal.1995) (in agreement concerning an installment sale with a balloon payment of

---

6. The only exception to this conclusion would be with respect to the two leasehold interests referenced in the Agreement since these interests constitute real property rather than personalty. However, Mr. Potter's unrefuted af-

fidavit indicates that both of these leases have been previously abandoned. As such, any failure by Message Express to convey those interests could not constitute a breach of the Agreement.

an automobile, the court noted that "a mere installment sale no longer involves an executory contract when the seller has already delivered the thing sold"); *General Motors Acceptance Corp. v. Rose (Matter of Rose)*, 21 B.R. 272 (Bankr.D.N.J.1982) (installment sales contract is nonexecutory where automobile has already been delivered). *Cf. Griffel v. Murphy (In re Wegner)*, 839 F.2d 533, 537 (9th Cir.1988)(contract for sale of cattle was executory where under Montana law, transfer of ownership of cattle cannot be accomplished by the mere taking of possession; duty to provide a bill of sale was a material obligation).

A contrary result was reached in *Walker v. Goodwin (In re Meadows)*, 39 B.R. 538, 540 (Bankr.W.D.Ky.1984), wherein the court concluded that a contract for the sale of a marina, which included both real and personal property, was executory despite the debtor's possession and control of assets because the creditor had a duty to transfer clear title upon settlement. Noticeably absent from the decision was any discussion of the Uniform Commercial Code provisions which other courts have found to be determinative. In light of this absence, this court finds *Meadows* unpersuasive.

Another decision which should be addressed is that of *In re Bencker*, wherein the court considered the issue of whether a contract for the purchase of a mobile home was executory. *See In re Bencker*, 122 B.R. 506 (Bankr.W.D.Mich.1990). It was argued therein that pursuant to MICH. COMP. LAWS ANN. § 440.2401(2) (U.C.C. § 2–401), title to the mobile home passed when the home was delivered despite the terms of the purchase contract which provided that transfer of title would not occur until the home was paid in full. *Id.* at 510. Another Michigan statute, however, which applied solely to mobile homes, provided

that "lawful transfer and ownership of a mobile home" was provided by a certificate of title. *Id.* (citing MICH. ADMIN. CODE r. 125.01101(1)(e)). The *Bencker* court reconciled these two conflicting provisions by holding that the specific provisions of the Mobile Home Commission Act governed over the more general provisions of the Uniform Commercial Code. *Id.* at 511. Since the purchaser would be unable to obtain title without the assistance of the seller because of Michigan's specific statutory scheme for mobile homes, the seller's obligation to relinquish ownership or provide the necessary assistance to the buyer to obtain the certificate of title would be a material breach, rendering the contract executory as to both parties. *Id.* at 511–12.

The *Bencker* decision is consistent with the conclusion reached by this court herein. But for the specific Michigan statute on mobile home conveyances, the *Bencker* court would have concluded that Michigan's version of U.C.C. § 401 controlled such that title passed upon delivery. In the present case, there is no such conflict with Tennessee's version of U.C.C. § 2–401, i.e., TENN. CODE ANN. § 47–2–401, so it is controlling as to the debtor's ownership interest.

## IV.

The Sixth Circuit Court of Appeals recently summarized the standards for considering a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure governs motions for summary judgment in adversary proceedings in bankruptcy court. . . . Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

R.Civ.P. 56(c). When reviewing a motion for summary judgment, the evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir.1990).... Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*Poss v. Morris (In re Morris)*, 260 F.3d 654, 665 (6th Cir.2001).

## V.

Based on all the foregoing, the court concludes that the Agreement is not an executory contract. Instead, the Agreement is simply a financing arrangement for the sale of personalty as the debtor alleges. Although there are competing affidavits as to what the parties intended in the Agreement, it is not necessary for the court to resolve this conflict since the true economic nature of the transaction is apparent from an examination of the Agreement itself. Granted, at first glance, the Agreement does appear to be a management agreement in conjunction with an option to purchase, as Message Express asserts. However, management agreements for a business generally provide for a set fee to the manager or a share of the profits to encourage proper management. The Agreement herein grants all the profit to the manager, i.e., the debtor, with the purported owner retaining only a monthly fee. Because the ability to share in the profits is quite possibly the most important benefit of ownership, the arrangement in the Agreement suggests that ownership has been transferred to the debtor. This conclusion is not negated by the fact that the Agreement requires the debtor to increase the business' gross revenues by $1,000 per month since Message Express had no ability to share in this increased revenue under the terms of the Agreement.

The true nature of the Agreement is buttressed by the undisputed fact that possession of all of the assets of the business were immediately turned over to the debtor, with the debtor being responsible for all expenses of the business, i.e., another attribute of ownership. Finally, and maybe most importantly, is the fact that the entire purchase price for the assets along with a reasonable rate of return would be paid in full by the end of the option period by way of the $4,000 monthly "management fee," such that no further payment would be required for the debtor to exercise its "purchase option." It simply defies logic that the Agreement is a true option to purchase when many of the assets to be purchased under the Agreement, i.e., the accounts receivable, computers, office furniture, etc., would have been collected or obsolete prior to the end of the nine-year period. This was a financing arrangement, pure and simple, and the language in the Agreement which provides for a "conveyance" of the assets upon exercise of the "option" was under Tenn. Code Ann. § 47–2–401 nothing more that the retention of a security interest, rather than absolute ownership interest. As such, the debtor is the owner of the assets in question. Accordingly, an order will be entered contemporaneously with the filing of this memorandum opinion denying the motion for summary judgment by Message

**234**

Express and granting the debtor's motion for partial summary judgment.